TURTLE WAX, INC., Plaintiff,

v.

FIRST BRANDS CORPORATION,
Defendant.

No. 90 C 5999.

United States District Court,
N.D. Illinois, E.D.

Dec. 27, 1991.

J. Patrick Herald, Philip J. Zadeik, William Lynch Schaller, Baker & McKenzie, Chicago, Ill., for plaintiff.

Jack C. Berenzweig, Jerome Gilson, Thomas Michael O'Malley, Thomas Alan Schmidt, Willian, Brinks, Olds, Hofer, Gilson & Lione, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ILANA DIAMOND ROVNER, District Judge.

### I. INTRODUCTION

This is an action brought by plaintiff Turtle Wax, Inc. ("Turtle Wax") against its competitor First Brands Corporation ("First Brands") for trade dress infringement pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), the Illinois Deceptive Trade Practices Act, Ill.Rev.Stat. ch. 121½, ¶¶ 312 *et seq.*, the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat. ch. 121½, ¶¶ 261 *et seq.*, and the Illinois common law of unfair competition and trademark infringement. At

issue are the trade dresses [1] of two competing, super-premium automobile polishes, one manufactured and sold by Turtle Wax and the other by defendant First Brands. The gravamen of plaintiff's complaint is that defendant's trade dress for its "Simoniz Ultimate" car wax infringes upon plaintiff's trade dress for its "Liquid Crystal" automobile polish.

In conjunction with its complaint, Turtle Wax also filed a motion for a preliminary injunction, requesting that defendant be restrained from utilizing the Simoniz Ultimate trade dress or any other colorable imitation of plaintiff's Liquid Crystal trade dress prior to a resolution of the merits of plaintiff's complaint. The Court granted plaintiff's request for expedited discovery and referred the preliminary injunction motion to Magistrate–Judge Ronald A. Guzman for an evidentiary hearing and a report and recommendation. The Magistrate–Judge conducted such a hearing from December 17 through December 21, 1990, and he issued his Report and Recommendation (the "Report") on March 28, 1991.[2] In that Report, Magistrate–Judge Guzman recommended that the Court deny plaintiff's motion for a preliminary injunction because Turtle Wax had failed to establish a likelihood of success on the merits of its trade dress claims. Pending before the Court are plaintiff's extensive objections to the Report of the Magistrate–Judge. For the reasons enumerated below, the Court will overrule those objections, will adopt the Report of Magistrate–Judge Guzman, and will deny plaintiff's motion for a preliminary injunction.

## II. FACTS

This case involves the trade dress of a premium automobile polish manufactured and sold by Turtle Wax under the trade name Liquid Crystal. Plaintiff markets and sells the Liquid Crystal product in two forms—as a polish, which is packaged in an upright "F-style" can, and as a cream or paste in a shorter, round can. (*See* Antweiler Physical Exhibit R, attached to this opinion as Appendix B.) Turtle Wax designed the Liquid Crystal trade dress with a glossy, black background, gold lettering, and red details. The front end of a gold Porshe is depicted on the package. Both the F-style and paste cans contain smoked, gray overcaps, housing terry cloth applicator sponges. Turtle Wax introduced this trade dress in the United States in August 1989 at the Automobile Parts and Accessories Association ("APAA") trade show. It was not officially introduced to the consuming public, however, until April 1990.[3]

In December 1989 or January 1990, First Brands began to develop a premium automobile polish to compete with plaintiff's Liquid Crystal. When introduced to the market in the latter part of 1990 and early 1991, defendant's Simoniz Ultimate Car

1. The Seventh Circuit explained in *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 935 (7th Cir. 1989), *cert. denied*, 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990), that the term "trade dress" "refers to the total image of a product, including features such as 'size, shape, color or color combinations, texture, graphics, or even particular sales techniques.'" (quoting *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir.1983)); *see also Nutrasweet Co. v. Stadt Corp.*, 917 F.2d 1024, 1027 n. 7 (7th Cir. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1640, 113 L.Ed.2d 735 (1991).

2. The Magistrate–Judge prepared two versions of his Report. One version contains confidential information with respect to the sales and advertising expenditures of the parties and has been filed under seal. The other version redacts the confidential information in the findings of fact made by the Magistrate–Judge, but does not alter his conclusions of law. The re-

dacted version of the Magistrate–Judge's Report is attached to this opinion as Appendix A; the page references to the Report contained herein refer to the public Report.

3. As detailed by the Magistrate–Judge, Turtle Wax initially offered its Liquid Crystal products for sale in the United States in February 1987. However, it discontinued sales in this country in the fall of that year. In July 1988, plaintiff began to sell its Liquid Crystal products in Canada through Canadian Tire, Canada's largest automotive products retailer. It was not until August 1989 that Turtle Wax reintroduced Liquid Crystal in the United States at the APAA show. Prior to doing so, Turtle Wax slightly altered the trade dress it had utilized in Canada, as well as that previously utilized in the United States. Thus, the exact trade dress which plaintiff seeks to protect here was not on the market until 1989 at the earliest. (*See* Report at 9–13.)

Wax was packaged in metal cans bearing a substantial similarity to plaintiff's Liquid Crystal products. Defendant's product also is sold both in a liquid form in an upright, F-style can and in a paste form in the shorter, round can. (*See* PX 141, attached to this opinion as Appendix C.) The Simoniz cans also are designed with a black background, primarily gold lettering, and red detailing, and they depict a flashy red sports car across the front of the can. The Simoniz Ultimate products also contain overcaps with terry cloth applicator sponges, although those overcaps are black opaque in color, rather than a smoked gray.

The Report of Magistrate–Judge Guzman sets out in detail these and other facts relating to the products at issue in this case. The Report also provides pertinent information relating to the relevant automotive market. Turtle Wax has not objected to any of the Magistrate–Judge's factual findings. In fact, Turtle Wax describes those findings as "fair and accurate representation[s] of the evidence adduced during the preliminary injunction hearing." (Plaintiff's Objections at 2.) Plaintiff's objections instead focus on Magistrate–Judge Guzman's application of the relevant facts to the legal authorities controlling plaintiff's claims. According to Turtle Wax, the Magistrate–Judge, "having made the correct findings, ... proceeded to misconstrue and misapply the applicable law to those findings." (*Id.*)[4] Because Magistrate–Judge Guzman made meticulous and detailed findings in his Report, and because the parties have not objected to any of those findings before this Court, the Court will adopt the factual findings of the Magistrate–Judge and will not reiterate those findings in this opinion. (*See* Report at 2–28.)

## III. ANALYSIS

■ The purpose of preliminary injunctive relief is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Faheem-el v. Klincar,* 841 F.2d 712, 717 (7th Cir.1988). Before a plaintiff will be entitled to such relief, it must establish the following five elements:

1) no adequate remedy at law exists;

2) the moving party will suffer irreparable harm absent injunctive relief;

3) the irreparable harm suffered absent injunctive relief outweighs the irreparable harm the respondent will suffer if the injunction is granted;

4) the moving party has a reasonable likelihood of prevailing on the merits; and

5) the injunction will not harm the public interest.

*Somerset House, Inc. v. Turnock,* 900 F.2d 1012, 1014–15 (7th Cir.1990); *see also Kellas v. Lane,* 923 F.2d 492, 493 (7th Cir. 1991). Each element must be shown before an injunction will issue. *Somerset House,* 900 F.2d at 1015; *see also Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 386–87 (7th Cir.1984). In recommending that the Court deny plaintiff's motion for a preliminary injunction, the Magistrate–Judge examined only the likelihood that plaintiff would succeed on the merits of its claims.[5] After reviewing

---

**4.** In particular, Turtle Wax emphasizes the following factual findings of the Magistrate–Judge and contends that, when applied to the applicable law, these findings would establish a better than negligible likelihood that plaintiff will succeed on the merits of its claims:

(1) that the *combination of elements* present on the LIQUID CRYSTAL trade dress were indeed unique and unlike any prior trade dress; (2) that Turtle Wax spent a substantial amount of time, effort and money in developing, promoting and advertising the LIQUID CRYSTAL trade dress; (3) that *"there was no doubt"* the defendant intentionally copied Turtle Wax's LIQUID CRYSTAL trade dress in formulating its own ULTIMATE trade dress; (4) that, of all the prod-

ucts received during the hearing, only LIQUID CRYSTAL and SIMONIZ ULTIMATE contained the same "combination of elements" in their trade dress; and (5) that these two products compete "head-to-head in a somewhat crowded marketplace".

(Plaintiff's Objections at 2 (plaintiff's emphasis).) The Court will address plaintiff's arguments with respect to these particular factual findings in the course of its discussion of the applicable law.

**5.** The standard required for a showing of likelihood of success is not particularly exacting; plaintiff need only show that its chances of succeeding "are better than negligible." *Kellas,*

all the evidence and the applicable law, Magistrate–Judge Guzman concluded that plaintiff had failed to show a reasonable likelihood of prevailing on the merits. (Report at 47.) Thus, in accordance with the Seventh Circuit's decision in *Ping v. National Education Association,* 870 F.2d 1369, 1371 (7th Cir.1989), the Magistrate–Judge declined to reach the other required elements for preliminary injunctive relief and recommended that plaintiff's motion be denied. (*Id.*)

Turtle Wax concedes that to establish a cause of action for trade dress infringement, it must prove both: (1) that the trade dress of its Liquid Crystal product is protectable—that is, it is inherently distinctive or has acquired secondary meaning, and (2) that there is a likelihood of confusion with respect to the origin of defendant's Simoniz Ultimate product. *See Roulo v. Russ Berrie & Co.,* 886 F.2d 931, 935 (7th Cir.1989), *cert. denied,* 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990); *Vaughan Manufacturing Co. v. Brikam International, Inc.,* 814 F.2d 346, 348 (7th Cir.1987). Moreover, even if plaintiff establishes both a protectable trade dress and a likelihood of confusion, it cannot prevail if defendant shows that plaintiff's trade dress is merely functional. *Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 870 F.2d 1176, 1183 (7th Cir.1989); *see also Eldon Industries, Inc. v. Rubbermaid, Inc.,* 735 F.Supp. 786, 795 (N.D.Ill.1990) (Rovner, J.). Plaintiff contends that it has established each of the required elements and that the Magistrate–Judge erred when he concluded that neither a protectable trade dress nor a likelihood of confusion had been shown. The Court addresses each of plaintiff's objections in turn.

*A. Inherent Distinctiveness.*

Turtle Wax first contends that Magistrate–Judge Guzman erred when he found that the Liquid Crystal trade dress was not inherently distinctive. Plaintiff agrees with the Magistrate–Judge that two tests exist for analyzing the inherent distinctiveness of a trade dress—that enunciated by the Second Circuit in *Seabrook Foods, Inc. v. Bar-Well Foods, Ltd.,* 568 F.2d 1342 (C.C.P.A.1977) (the "*Seabrook* test"), and the alternative test utilized by the Fifth Circuit in *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.,* 659 F.2d 695 (5th Cir.1981), *cert. denied,* 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982) (the "*Chevron* test"). (*See* Report at 30.)[6] Although the parties and the Magistrate–Judge agree that these are the appropriate tests for inherent distinctiveness, Turtle Wax maintains that the Magistrate–Judge erred when he found that plaintiff had failed to satisfy either test.

1. Seabrook

In applying the *Seabrook* test of inherent distinctiveness, the Magistrate–Judge explained that he was required to determine whether plaintiff's trade dress "was a 'common' basic shape or design, whether it was unique or unusual in a particular field, or whether it was a mere refinement of commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods." (Report at 36.) *Seabrook,* 568 F.2d at 1344; *see also AmBRIT, Inc. v. Kraft,* 812 F.2d 1531, 1536 (11th Cir.1987), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987); *Wiley v. American Greetings Corp.,* 762 F.2d 139, 141 (1st Cir.1985); *Blue Coral, Inc. v. Turtle Wax, Inc.,* 664 F.Supp. 1153, 1161 (N.D.Ill.1987) (Aspen, J.). Magistrate–Judge Guzman concluded that the field or class of goods to which plaintiff's product belongs is that of "automotive appearance chemicals." (*Id.* at 37.)[7] *See Blue Coral,* 664 F.Supp. at 1161 (automobile wheel cleaner part of "au-

---

923 F.2d at 494; *Somerset House,* 900 F.2d at 1015.

**6.** To date, the Seventh Circuit has not identified a definitive test to be applied in determining whether a trade dress is inherently distinctive. *See Blue Coral, Inc. v. Turtle Wax, Inc.,* 664

F.Supp. 1153, 1160 (N.D.Ill.1987) (Aspen, J.). Given the Seventh Circuit's silence, the Court agrees with the parties that application of the *Seabrook* and *Chevron* tests is appropriate here.

**7.** Neither party has objected to this conclusion.

tomotive appearance chemicals" group or class of goods). Within this class, the Magistrate–Judge found that the "basic shape and design of the Liquid Crystal trade dress is common" and that the trade dress "is not unique in its field." (*Id.* at 38.) Instead, the Magistrate–Judge determined that plaintiff's trade dress is "a combination and refinement of elements already found in abundance in the field of automotive appearance products." (*Id.*) Accordingly, Magistrate–Judge Guzman concluded that plaintiff's trade dress is not inherently distinctive under the *Seabrook* analysis and recommended that the Court so find. (*Id.* at 39.)

Turtle Wax objects to this recommendation, contending that a finding of inherent distinctiveness was required by the Magistrate–Judge's conclusion that the combination of elements in the Liquid Crystal trade dress was distinct to the industry. For example, plaintiff points to the Magistrate–Judge's statement that "[a]lthough there were at this time no substantially similar packages for 'premium' quality car waxes, it is also true that the elements of the Liquid Crystal packaging, taken separately, were not new." (Report at 6.) Moreover, Magistrate–Judge Guzman found that among the products introduced into evidence by First Brands to establish the functionality and common nature of the individual elements of plaintiff's trade dress, "not one single product possessed *all* of the elements in combination as contained on the entire Liquid Crystal package and trade dress." (*Id.* at 7–8; *see also id.* at 23.)[8] According to Turtle Wax, the Magistrate–Judge's conclusion that plaintiff's trade dress is common to its field is at odds with the evidence and his own finding that the combination of elements utilized in the Liquid Crystal trade dress was unique and the first of its kind in the industry. Thus, plaintiff contends that the Magistrate–Judge was "100% wrong" in concluding that the Liquid Crystal trade dress is not inherently distinctive under the *Seabrook* test. (*See* Plaintiff's Objections at 5.)

Turtle Wax relies upon the Seventh Circuit's decision in *Roulo v. Russ Berrie & Co., supra,* for the proposition that the distinctiveness of a product's trade dress should be considered as a whole and that it is improper to analyze the distinctiveness of elements of a trade dress individually. In *Roulo,* the Court of Appeals reviewed a jury's determination that the plaintiff's line of sentimental greeting cards was inherently distinctive. Like First Brands here, the defendant in *Roulo* emphasized that the plaintiff's greeting cards "incorporated several common features such as stripes, dots, handwriting and other common design elements which are indigenous to all greeting cards and do not represent a trade-dress element capable of protection." 886 F.2d at 936. The plaintiff, on the other hand, presented evidence that no competing line of greeting cards utilized the same combination of elements used in her line. *Id.* The Seventh Circuit, without addressing either the *Seabrook* or *Chevron* tests, found adequate evidence to support the jury's verdict of distinctiveness. *Id.* In particular, the Court held that

> [t]he fact that [the plaintiff's] cards incorporated common, indistinct elements such as lines and handwriting does not refute the fact that Roulo's combination of these elements was sufficiently unique to warrant trade-dress protection. Trade dress encompasses the overall appearance of a product, including its size, color or color combinations, texture, graphics, packaging or other visual features.

*Id.; see also Hartford House, Ltd. v. Hallmark Cards, Inc.,* 846 F.2d 1268, 1271 (10th Cir.1988), *cert. denied,* 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988); *Spraying Systems Co. v. Delavan, Inc.,* 762 F.Supp. 772, 782 (N.D.Ill.1991) (Shadur, J.); *Accurate Leather & Novelty Co. v. LTD Commodities, Inc.,* 18 U.S.P.Q.2d 1327, 1330, 1990 WL 205865 (N.D.Ill.1990) (Duff, J.) ("The fact that common indistinct elements are combined does not undermine

---

**8.** In fact, the Magistrate–Judge found that defendant's Simoniz Ultimate product "came the closest by far" to duplicating all of the elements of the Liquid Crystal trade dress. (*Id.* at 8.)

the fact that the combination of these items is distinctive."). Consistent with *Roulo* and comparable authorities, the Court agrees with Turtle Wax that the Liquid Crystal trade dress must be considered as a whole, rather than simply as the sum of its individual parts. The focus of any trade dress claim must be on the combined effect of all facets of the plaintiff's trade dress. However, that conclusion does not require the Court to reject the recommendation of the Magistrate–Judge. Even considering the Liquid Crystal trade dress as a whole, and in light of the Magistrate–Judge's finding that the combination of elements was unique to its field, the Court still finds that plaintiff's trade dress is not inherently distinctive under the *Seabrook* test.

In carefully applying the three-part inquiry required by *Seabrook*, Magistrate–Judge Guzman concluded first that the basic shape and design of the Liquid Crystal trade dress is common. (Report at 38.) That finding is amply supported by the evidence. The Magistrate–Judge found that "the basic shape and design of the trade dress is an F-style can with an overcap and the name of the product prominently displayed in bold lettering in the upper third of the can." (*Id.* at 37.)[9] The Magistrate–Judge concluded that such a shape and design have been utilized in the relevant market for years. For example, the Magistrate–Judge described in detail how F-style and round paste cans with overcaps have been used in the automotive appearance chemicals market for a number of years. (Report at 37–38; *see also id.* at 3–4.) Certain products even utilized the same color components as plaintiff's Liquid Crystal. (*Id.* at 37 n. 19.) Moreover, when plaintiff was developing its Liquid Crystal trade dress, there was already at least one high-end automobile polish on the market—Liquid Glass—which was packaged in an F-style can, depicted a red automobile on the front, and was designed with the colors black and gold, although the Liquid Glass package utilized a gold background and black lettering. (Report at 5, 7; DX 87.) Despite the fact that Turtle Wax may have

created a unique combination of these basic elements in designing its Liquid Crystal trade dress, the above evidence amply supports the Magistrate–Judge's conclusion that the basic shape and design of plaintiff's trade dress were common in the relevant field. *See Blue Coral,* 664 F.Supp. at 1161–62.

■ Magistrate–Judge Guzman then considered the second and third *Seabrook* questions together, concluding that plaintiff's trade dress is not unique to its field, but is merely a "combination and refinement of elements already found in abundance in the field of automotive appearance products with which the consumer is confronted when he/she ventures into a store to shop for an automobile polish." (Report at 38.) That determination also finds support in the evidence detailed above. This Court finds itself in agreement with the Magistrate–Judge's conclusion that Turtle Wax simply has refined the basic elements of a trade dress which has been utilized extensively by other manufacturers in the industry. There is no single component of the Liquid Crystal trade dress that truly is unique to that product. For example, overcaps as well as F-style and round paste cans have been used in the industry for years. Turtle Wax simply refined its overcap by making it a smoked, gray color and by including in the cap a terry cloth applicator. Moreover, seemingly the most important refinement to plaintiff's F-style and paste cans in terms of making them distinctive relate to their color components—the black background, gold lettering, and red details, and particularly the way in which each is utilized on the package. First, the Magistrate–Judge found that a black background is extremely common in the automotive appearance chemicals market, "as is the use of the color combination of gold, red and white on a black background." (Report at 38.) Turtle Wax has not challenged these findings, and this Court finds them amply supported by the evidence. Moreover, in light of *Nutrasweet Co. v. Stadt Corp.,* 917 F.2d 1024 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1640,

---

**9.** Plaintiff has not objected to this finding.

113 L.Ed.2d 735 (1991), in which the Court of Appeals reaffirmed that color alone cannot provide the basis for trade dress protection, the Court is understandably hesitant to base a finding of inherent distinctiveness solely upon the particular color combination of plaintiff's packaging. As the Magistrate–Judge correctly concluded, Turtle Wax cannot be accorded the exclusive right to use the most fashionable colors extant for achieving the premium look it seeks. (*See* Report at 34.) This Court, therefore, agrees with Magistrate–Judge Guzman that plaintiff's Liquid Crystal trade dress is merely a combination and refinement of elements already prevalent in the automotive appearance chemicals market.

Given that conclusion, the Court cannot agree with Turtle Wax that a finding of inherent distinctiveness was required simply because no existing product utilized precisely the same combination of elements as plaintiff's Liquid Crystal trade dress. Although he found the individual elements of plaintiff's trade dress to be commonplace in the industry, the Magistrate–Judge did note that no product possessed those same elements in combination. (Report at 6, 8.) According to Turtle Wax, this finding compelled the conclusion that the Liquid Crystal trade dress was new and unique. However, such a rule essentially would extend trade dress protection to every new compilation of elements in a particular field and would run afoul of the *Seabrook* tenet that a trade dress is not unique and distinctive if it merely refines common forms of ornamentation utilized in a particular field of goods. Presumably, it could be said about the trade dress of any new product that no competitive product combines precisely the same elements in its trade dress. Essentially, that is all the Magistrate–Judge found in this case. However, that fact alone does not make the product's trade dress inherently distinctive. Any other rule essentially would require a finding of inherent distinctiveness whenever a new product enters the market. *See Blue Coral*, 664 F.Supp. at 1163.[10]

Moreover, this finding is not inconsistent with the Seventh Circuit's decision in *Roulo*. In affirming a jury finding of distinctiveness in that case, the Court of Appeals emphasized that a trade dress must be considered as a whole and that the simple fact that the trade dress incorporated common, indistinct elements did not negate a finding of distinctiveness. 886 F.2d at 936. The greeting cards at issue in *Roulo*, however, were far different from plaintiff's products in the instant case. *Roulo* involved sentimental greeting cards which the jury determined were copied by defendant subsequent to the termination of an agreement under which the defendant had sold the plaintiff's greeting cards. *Id.* at 934. Although the plaintiff's greeting cards included such common elements as stripes, dots, lines, and handwriting, the Court of Appeals concluded that the plaintiff's combination of these elements created an overall look which was distinctive and protectable. *Id.* at 936. In short, in comparison to the greeting cards already on the market, the Court of Appeals found the overall look of the plaintiff's cards distinctive and not simply a refinement of existing cards. This Court has made a contrary finding in the instant case. The Court does not interpret the Seventh Circuit's decision in *Roulo* to mean that any seemingly unique combination of common elements is sufficient to create a protectable trade dress, particularly where the basic shape and design of the product is merely a refinement of existing forms of ornamentation. Thus, this Court cannot agree that the Seventh Circuit's decision in *Roulo* requires a finding of inherent dis-

10. In *Blue Coral,* Judge Aspen explained that [i]n deciding whether a trade dress is inherently distinctive, we look at the overall impression of the various elements *but we still must consider how unique this new compilation is in comparison to what is already in the field.* This will necessarily encompass a consideration of the various elements, otherwise every trade dress would have instant protectability that exceeds even trademark protection. This protection would extend to aspects of a trade dress that if used as a trademark could not be protected absent secondary meaning, such as descriptive elements and functional elements.
664 F.Supp. at 1163 (emphasis added).

tinctiveness in this case. Although plaintiff's trade dress may be different in degree from that of other automotive appearance products that had been on the market, it is not different in kind. *Blue Coral*, 664 F.Supp. at 1163. Under the *Seabrook* test, therefore, it is not entitled to trade dress protection.

2. Chevron.

■ The second test of inherent distinctiveness analyzed by the Magistrate–Judge was that set forth by the Fifth Circuit in *Chevron Chemical Co. v. Voluntary Purchasing Groups*, 659 F.2d 695, 702 (5th Cir.1981), *cert. denied*, 457 U.S. 1126, 102 S.Ct. 2947 (1982).[11] In that case, the Fifth Circuit applied principles of trademark law to a claim of trade dress infringement. In so doing, the Fifth Circuit concluded that a trade dress may be protected even where a plaintiff is unable to establish secondary meaning if "the features of the trade dress sought to be protected are arbitrary and serve no function either to describe the product or assist in its effective packaging." *Chevron*, 659 F.2d at 702; *see also Blue Coral*, 664 F.Supp. at 1160. In applying this test to the instant case, the Magistrate–Judge concluded that the Liquid Crystal trade dress is not distinctive because the trade dress as a whole, as well as each of its individual components, "was carefully and intentionally chosen for its function in describing this product as a premium and expensive car polish." (Report at 31–32.) Similarly, the Magistrate–Judge also found that plaintiff's trade dress serves to assist in the effective packaging of the product. (*Id.* at 34.) Accordingly, because he found that "so many of the elements of the trade dress are nonarbitrary and functional," the Magistrate–Judge recommended a finding that the trade dress was not inherently distinctive under *Chevron*. (*Id.* at 35.)

First, Turtle Wax contends that the Magistrate–Judge erred when he focused on plaintiff's trade dress as descriptive of a high-end, premium car polish. According to Turtle Wax, a trade dress only serves a function in describing a product "where it describes some tangible aspect of the product or its characteristics." (Plaintiff's Objections at 6.) The Liquid Crystal trade dress purportedly did neither; instead, it only served to create for the product a premium image or appearance. (*Id.* at 7.) According to plaintiff, "the mere fact that the Liquid Crystal trade dress served to convey a 'meaning' or 'image' (which probably every trade dress is intended to do) does *not* make it [a] 'function to describe the product', and thus not distinctive." (*Id.*) The Court is unpersuaded by plaintiff's position.

■ An element of a product's trade dress is merely descriptive of the product, and accordingly not arbitrary, where "it specifically describes a characteristic or an ingredient" of the product. *A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 906–07 (7th Cir.1986); *Blue Coral*, 664 F.Supp. at 1160 n. 10. A trade dress utilized to convey a particular image—here, the image of the high-end, premium nature of plaintiff's automobile polish—clearly is descriptive of a characteristic of the product. Magistrate–Judge Guzman exhaustively detailed the evidence to the effect that plaintiff's trade dress was chosen to advance the image of a premium and expensive car polish. (Report at 31–34.) It is nonsensical for plaintiff then to suggest that its trade dress is arbitrary and devoid of any meaning. The Court agrees with Magistrate–Judge Guzman that elements of a trade dress which are chosen to convey the image of an upscale, premium product are descriptive and nonarbitrary. *See Blue Coral*, 664 F.Supp. at 1160 (trade dress designed to promote "high tech look" of a product is descriptive and nonarbitrary).[12]

11. As noted by the Magistrate–Judge, the *Chevron* decision was cited with approval by our own Court of Appeals in *Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.*, 781 F.2d 604, 608 (7th Cir. 1986). (*See* Report at 30.)

12. In conjunction with its discussion of the *Seabrook* and *Chevron* tests, plaintiff also contends that Magistrate–Judge Guzman erred when he found that the Liquid Crystal trade dress was functional. Turtle Wax then sets out to establish the proper legal standard for determining

## B. Secondary Meaning.

Having concluded that Turtle Wax failed to establish the inherent distinctiveness of its Liquid Crystal trade dress, the Magistrate–Judge proceeded to consider whether that trade dress had acquired secondary meaning. The term "secondary meaning," as stated by Magistrate–Judge Guzman, "denotes an association in the mind of the consumer between the trade dress of a product and a particular producer." (Report at 39 n. 22 (citing *A.J. Canfield,* 796 F.2d at 907).) *See also Blue Coral,* 664 F.Supp. at 1163. As this Court explained in *Eldon,* the determination of whether a "trade dress has acquired a secondary meaning is a question of fact." 735 F.Supp. at 795; *see also Vaughan Manufacturing,* 814 F.2d at 349. As noted by the Magistrate–Judge, the following factors are to be considered in determining whether a trade dress has acquired secondary meaning: "(a) consumer testimony; (b) consumer surveys; (c) exclusivity, length, and manner of use; (d) amount and manner of advertising; (e) amount of sales and number of customers; (f) established place in the market; and (g) proof of intentional copying." (*See* Report at 39 (citing *Echo Travel, Inc. v. Travel Associates, Inc.,* 870 F.2d 1264, 1267 (7th Cir.1989).)

Magistrate–Judge Guzman concluded that Turtle Wax had presented no direct evidence of secondary meaning. (Report at 39.) In fact, the Magistrate–Judge found that the only factor weighing in plaintiff's favor was the "very strong" proof that defendant had intentionally copied the Liquid Crystal trade dress. Aside from intentional copying, the Magistrate–Judge concluded that "[t]here is no other evidence which even remotely suggests the existence of secondary meaning and there is ... much evidence to the contrary." (*Id.* at 42.) In particular, the Magistrate–Judge noted the relatively short period of time in which the Liquid Crystal trade dress has been utilized by plaintiff. The exact trade dress which Turtle Wax seeks to protect here has only been in existence since August 1989 and was only introduced to the consuming public in April 1990. (*Id.* at 40.) In addition, the Magistrate–Judge emphasized that plaintiff had only conducted a limited amount of advertising and that none of that advertising focused specifically upon the product's trade dress. (*Id.*) He also found that no direct evidence of consumer confusion had been presented because Turtle Wax had not requested that its expert conduct a consumer survey. (*Id.*) Finally, the Magistrate–Judge also emphasized that Turtle Wax does not sell Liquid Crystal under its own name, but

the functionality of a trade dress and purports to explain in detail how the Magistrate–Judge deviated from that standard. (Plaintiff's Objections at 7–12.) Plaintiff's efforts are misdirected. The Magistrate–Judge never determined (and was not required to determine) that the Liquid Crystal trade dress was functional, at least for purposes of defendant's affirmative defense of functionality. Instead, his use of the term "functional" relates only to application of the *Chevron* test and to his conclusion that the trade dress is nonarbitrary in that it serves a "function" to describe plaintiff's product and to assist in its effective packaging. Such a functionality analysis requires a completely different inquiry than that involved in the consideration of a functionality defense to trade dress infringement.

A review of the requirements of the affirmative defense of functionality makes clear that the Magistrate–Judge never reached that issue in his Report. First, the functionality defense need only be addressed once plaintiff has established a protectable trade dress. *See Eldon,* 735 F.Supp. at 815; *Keystone Camera Products Corp.*

*v. Ansco Photo–Optical Products Corp.,* 667 F.Supp. 1221, 1225 (N.D.Ill.1987) (Holderman, J.). The Magistrate–Judge recommended that plaintiff had not done so here. In addition, as the Seventh Circuit explained in *Schwinn,* "[f]or purposes of a defense against trade dress infringement, 'functional' means not simply that the feature serves a function, but that the feature is necessary to afford a competitor the means to compete effectively." 870 F.2d at 1188; *see also W.T. Rogers Co. v. Keene,* 778 F.2d 334, 339 (7th Cir.1985) ("a functional feature is one which competitors would have to spend money not to copy but to design around"); *Accurate Leather,* 18 U.S.P.Q.2d at 1330–31. The defendant bears the burden of proof in establishing this defense. Magistrate–Judge Guzman clearly never engaged in such a functionality analysis here because he concluded that no protectable trade dress had been shown. As a result, he was not required to reach First Brands' affirmative defense of functionality, and he did not do so. This Court agrees with the Magistrate–Judge's analysis and finds plaintiff's objections simply misguided.

utilizes an entirely new name, Plastone Co., which is virtually unknown to the consuming public. Magistrate–Judge Guzman noted that although a plaintiff need not show that consumers are aware of the ultimate producer of a product, secondary meaning is more easily shown if consumers are aware that a product is produced and sold by a well-known company such as Turtle Wax. (*Id.*) Therefore, based upon his analysis of the relevant factors, the Magistrate–Judge concluded that "the evidence does not reach that level necessary to establish even a more than negligible likelihood of success in establishing secondary meaning." (*Id.* at 42.)

■ Plaintiff raises a number of objections to the Magistrate–Judge's analysis. First, Turtle Wax suggests that the Magistrate–Judge accorded too little weight to the evidence of intentional copying. The Magistrate–Judge stated that he had no doubt that First Brands "intentionally copied and emulated many of the design components, e.g., color combination and graphics of the Turtle Wax product."[13] However, he also correctly held that, in this circuit, proof of intentional copying alone is insufficient to establish secondary meaning. (*Id.* at 41–42.) As this Court explained in *Eldon*, although evidence of intentional copying is probative of the issue of secondary meaning, it does not create a presumption that secondary meaning exists. 735 F.Supp. at 796; *see also Vaughan*, 814 F.2d at 349; *Keystone Camera*, 667 F.Supp. at 1231.[14] Instead, plaintiff was required to present other evidence in addition to that of intentional copying which would tend to show that the Liquid Crystal trade dress had acquired secondary meaning. The Magistrate–Judge found that Turtle Wax had failed to do so, and therefore, he properly concluded that no

secondary meaning had been shown. Accordingly, the question before this Court on its review of the Magistrate–Judge's recommendation is whether any of plaintiff's evidence in addition to that of intentional copying was sufficient to establish secondary meaning.

■ Turtle Wax submits that secondary meaning was shown by evidence of its advertising and promotional activities and the "unparalleled commercial success" of the Liquid Crystal product. (Plaintiff's Objections at 14.) The Court agrees that such evidence may be relevant to the question of whether a trade dress has acquired secondary meaning. *See First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir.1987). However, the Court also agrees with the Magistrate–Judge's analysis that such evidence is entitled to lesser weight where the product has been on the market for such a relatively short period of time and the advertising and promotional activities at issue emphasize only the product itself, rather than the trade dress plaintiff seeks to protect. *See Keystone Camera*, 667 F.Supp. at 1231. Even where a party has engaged in extensive advertising and promotional efforts, those efforts do not necessarily indicate that consumers would associate plaintiff's trade dress with a particular source if the advertising does not itself emphasize the trade dress. *See First Brands*, 809 F.2d at 1383. Thus, the Court is unpersuaded by plaintiff's suggestion that it can establish secondary meaning simply by means of an advertising and promotional campaign which only displays but does not emphasize the trade dress of its product. If that were true, the trade dress of virtually every advertised product would acquire secondary meaning.[15] The Magistrate–Judge ap-

---

13. In its response to plaintiff's objections, First Brands contests Magistrate–Judge Guzman's finding of intentional copying, contending that because of their descriptive, nonarbitrary, and functional nature, defendant was entitled to imitate particular elements of plaintiff's trade dress. The Court need not review the issue of intentional copying, however, because it agrees with the Magistrate–Judge that even assuming intentional copying, Turtle Wax has failed to establish secondary meaning.

14. *Cf. Osem Food Industries, Ltd. v. Sherwood Foods, Inc.*, 917 F.2d 161, 163 (4th Cir.1990) (rebuttable presumption of secondary meaning arises from evidence of intentional copying).

15. Plaintiff's apparent confusion over the type of advertising and promotional activities necessary to establish secondary meaning is evidenced by its reliance on Magistrate–Judge Guzman's finding that survey evidence relating to the effectiveness of plaintiff's television advertis-

propriately considered the extent and nature of plaintiff's advertising and promotional efforts in considering whether the Liquid Crystal trade dress had acquired secondary meaning.

■ Finally, Turtle Wax attacks the Magistrate–Judge's reliance on the relatively short life of the Liquid Crystal trade dress as a factor negating secondary meaning. According to Turtle Wax, there is no requirement that a trade dress be used for a particular length of time before it can acquire secondary meaning. (Plaintiff's Objections at 16.) Generally, the Court is in agreement with that proposition. *See Echo Travel*, 870 F.2d at 1269 (no particular period of use is required to establish secondary meaning). However, Turtle Wax simply is wrong if it intends to suggest that Magistrate–Judge Guzman drew a definitive and arbitrary line and then determined that plaintiff had utilized its trade dress for an insufficient period of time to cross that line. To the contrary, the Magistrate–Judge simply noted that plaintiff's trade dress was only introduced to consumers in April 1990 and that in conjunction with all of the other relevant factors, this was a relatively short period of time in which to acquire secondary meaning. (Report at 40.) That finding is in accord with the Seventh Circuit's instruction in *Echo Travel* that although a relatively short period of use does not preclude

ing "revealed that consumer recognition of the name 'Liquid Crystal' was very high relative to the other automotive polish commercials against which it was tested." (Report at 17.) The results of that survey, however, apparently reveal nothing about consumer recognition of the Liquid Crystal trade dress. It is the trade dress which Turtle Wax seeks to protect here, not the Liquid Crystal name. Thus, the consumer survey relied upon by Turtle Wax is not probative on the issue of secondary meaning.

16. Turtle Wax places substantial reliance on the decision in *L.A. Gear Inc. v. Thom McAn Shoe Co.*, 12 U.S.P.Q.2d 1001 (S.D.N.Y.1989), to support its argument that secondary meaning can be acquired despite the fact that a product may only have been on the market for a relatively short period of time. The decision in that case does not aid plaintiff's cause. In *L.A. Gear*, the district court found that use of the plaintiff's shoe design for only one year "cuts against a finding of secondary meaning." *Id.* at 1010.

a demonstration of secondary meaning, it clearly does not weigh in plaintiff's favor. 870 F.2d at 1264; *see also Laureyssens v. Idea Group, Inc.*, 768 F.Supp. 1036, 1048 (S.D.N.Y.1991); *Keystone Camera*, 667 F.Supp. at 1231.[16] The Court concludes that the Magistrate–Judge appropriately considered the short life of the Liquid Crystal trade dress in rejecting plaintiff's claim of secondary meaning.

■ The Court, having considered and rejected each of plaintiff's objections to the Magistrate–Judge's recommendation regarding secondary meaning, hereby adopts that recommendation.

## C. Likelihood of Confusion.

■ Having concluded that Turtle Wax failed to establish a protectable trade dress either by showing inherent distinctiveness or secondary meaning, the Magistrate–Judge noted that he need not consider whether there was a likelihood of consumer confusion. For the sake of completeness, however, Magistrate–Judge Guzman considered that issue and determined that no such likelihood existed here. (Report at 44–47.) Because Turtle Wax also has objected to this recommendation, the Court will address the issue in order to complete its analysis.

However, despite this short period of use, the district court found that the consuming public had come to associate plaintiff with its particular trade dress. *Id.* The district court's determination was based upon its analysis of evidence relating to attempts to imitate the plaintiff's design, the plaintiff's substantial advertising efforts featuring the trade dress, its impressive sales figures, consumer studies indicating "some degree of consumer recognition of origin," and unsolicited media coverage of the plaintiff's product. *Id.* at 1009–1010. In light of this evidence, the court found that plaintiff's product had acquired secondary meaning in the eyes of the consuming public despite its relatively short life. *Id.* at 1011. Similar evidence is lacking in the instant case. Although the Court agrees that *L.A. Gear* supports plaintiff's assertion that a product may acquire secondary meaning within a relatively short time, the case ultimately is of little help to plaintiff because the substantial evidence of secondary meaning in that case simply is lacking here.

In *Roulo v. Russ Berrie & Co., supra,* the Seventh Circuit explained that the factors relevant to the likelihood of confusion analysis include

> the similarity of the trade dresses, the products to which the trade dresses are attached, the area and manner of concurrent use, the degree of care likely to be exercised by consumers, the strength of the plaintiff's trade dress, and the actual confusion and intent on the part of the alleged infringer to pass off the infringer's goods as those of the plaintiff.

886 F.2d at 937; *see also Schwinn,* 870 F.2d at 1185. The Court of Appeals has stated that " '[n]one of these factors by itself is dispositive of the likelihood of confusion question, and different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved.' " *International Kennel Club v. Mighty Star, Inc.,* 846 F.2d 1079, 1087 (7th Cir.1988) (quoting *Marathon Manufacturing Co. v. Enerlite Products Corp.,* 767 F.2d 214, 218 (5th Cir.1985)).

In analyzing the relevant factors, Magistrate–Judge Guzman found the similarity of the two trade dresses "undisputed." (Report at 44.) In fact, after listing their similarities, he noted that "[t]his is a significant list of common elements for two products which ... are meant to compete head-to-head in a somewhat crowded marketplace." (*Id.*) Despite the basic similarities, however, the Magistrate–Judge also noted a number of important differences. First, the Magistrate–Judge found it significant that defendant's product prominently displays the company name "Simoniz" across the top in white lettering. No comparable depiction appears on the Liquid Crystal trade dress. (*Id.*) The Magistrate–Judge thought this distinction particularly significant because of the prominence of the name "Simoniz" in the automotive appearance chemicals market. (*Id.* at 45.) According to the Magistrate–Judge, it is unlikely that consumers will be confused by the products when one displays the well-known name "Simoniz" so prominently. (*Id.*) Magistrate–Judge Guzman also emphasized that defendant's trade dress reveals that it is a "car wax," as opposed to a polish. This is a significant difference to users of premium automotive appearance products, who, the Magistrate–Judge found, are attentive consumers who are likely to read labels carefully. (*Id.*) Thus, despite the fact that the Magistrate–Judge found the trade dresses to be similar, he also found that there were significant distinguishing factors which would minimize the likelihood of any consumer confusion. (*Id.* at 46–47.)

Beyond the similarity factor, the Magistrate–Judge did not consider each digit of confusion in isolation in conducting his likelihood of confusion analysis.[17] Based upon its review of Magistrate–Judge Guzman's findings, as well as its own review of the relevant factors, however, the Court concludes that the clear weight of those factors supports the conclusion of the Magistrate–Judge. The fact that the trade dresses are similar favors Turtle Wax, as does the similarity of the areas and stores in which the products are sold. However, the Court agrees with the Magistrate–Judge that the difference in the products themselves—that is, between a car wax and a car polish—is significant to a consumer purchasing a premium automotive appearance product. (*See* Report at 45.) Moreover, the Magistrate–Judge found that the consumers of such products ("car buffs" as he called them) exercise a high degree of care in purchasing automotive appearance products and that they are not likely to be confused by the similarities in

---

17. Turtle Wax in fact chides the Magistrate–Judge for not specifically setting forth and individually analyzing the relevant digits of confusion, therefore making it difficult for Turtle Wax to follow the Magistrate–Judge's "likelihood of confusion" analysis. (Plaintiff's Objections at 17–18.) The Court would only note that the Court of Appeals has in the past been critical of a "pedantic" application of the relevant factors, calling such an application, without an assessment of the totality of the relevant circumstances, a "misapplication of the test" which constitutes an error of law. *Schwinn,* 870 F.2d at 1187. The Court finds the Magistrate–Judge's application of the test appropriate.

the trade dresses. (*Id.*) [18] Moreover, the Magistrate–Judge concluded, and this Court reached the same conclusion above, that Turtle Wax has not established a protectable trade dress. Thus, "the strength of the plaintiff's trade dress" is a significant factor which clearly favors First Brands. As to evidence of actual confusion, Turtle Wax showed none. Instead, its expert only testified that there was a potential for such confusion. As a result, that factor also does not weigh in plaintiff's favor. Finally, although the Magistrate–Judge found strong evidence of intentional copying, he did not find that First Brands intended to pass off its product as that of the plaintiff.[19] Instead, the Magistrate–Judge focused on the substantial price differential between the products,[20] concluding that this price difference evidenced an intent to differentiate the products, rather than to confuse them. (Report at 46.) Considering these findings as a whole, the Court agrees with the Magistrate–Judge that no likelihood of confusion has been shown. *See Schwinn*, 870 F.2d at 1187.

Plaintiff's objections to the Magistrate–Judge's recommendation simply highlight those factors which would favor its position, essentially ignoring the factors which would favor defendant. The Magistrate–Judge considered the totality of the circumstances in concluding that Turtle Wax had failed to show that defendant's trade dress was likely to create confusion in the mind of the typical consumer of a premium, automotive appearance product. (Report at 46–47.) The Court agrees with the Magistrate–Judge's conclusion and adopts his reasoning.

Because the Court agrees that plaintiff's Liquid Crystal trade dress is not inherently distinctive, that it has not acquired secondary meaning, and that it is unlikely that the typical consumer would be confused as to the origin of defendant's product, the Court also agrees with the Magistrate–Judge that plaintiff has a less than negligible likelihood that it will succeed on the merits of its claims.[21] Given that conclusion, the Court does not reach the other elements required for the issuance of preliminary injunctive relief. *See Ping v. National Education Association*, 870 F.2d 1369 (7th Cir.1989).

## IV. CONCLUSION

For the foregoing reasons, the Court adopts Magistrate–Judge Guzman's Report

---

**18.** The characteristics of the relevant consumer are particularly important because the likelihood of confusion essentially is a test of consumer confusion; as the Seventh Circuit has held, " '[t]he test [of likelihood of confusion] is not simply a 'side-by-side one', made by the court through a personal comparison, but rather is one of consumer confusion, in light of the manner in which consumers purchased these products.' " *Schwinn*, 870 F.2d at 1187 (quoting district court opinion.)

**19.** Whether a presumption of a likelihood of confusion arises from proof of intentional copying is a question which has divided the circuit courts. The Fourth Circuit recently joined the Second and Ninth Circuits in holding that evidence of copying of a competitor's trade dress raises a rebuttable presumption that consumers are likely to be confused. *See Osem Food Industries, Ltd. v. Sherwood Foods, Inc.*, 917 F.2d 161, 164 & n. 6 (4th Cir.1991); *see also Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 618 F.2d 950, 954 (2d Cir.1980); *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 354 (9th Cir.1979). The Third, Seventh, and Eleventh Circuits, on the other hand, have concluded that no such presumption arises, but that proof of intentional copying is only one of the many factors to consider. *See Schwinn*, 870 F.2d at 1184; *American Home Products v. Barr Laboratories, Inc.*, 834 F.2d 368, 371 (3d Cir.1987); *Brooks Shoe Manufacturing Co. v. Suave Shoe Corp.*, 716 F.2d 854, 859 n. 13 (11th Cir.1983). Of course, this Court is bound to follow the Seventh Circuit's direction in *Schwinn* that no presumption applies. Thus, the Court need not reach this issue, but it concludes that even if such a presumption were applied, First Brands probably satisfied its burden of rebutting the presumption here.

**20.** The undisputed evidence established that Liquid Crystal sold for between $14.00 and $17.00, whereas defendant charged only $6.99 for Simoniz Ultimate. The Court agrees with the conclusion of the Magistrate–Judge that this "price difference alone is enough to make the consumer stop and take notice of the fact that these are two significantly different products." (Report at 46.)

**21.** Because Turtle Wax has failed to establish a protectable trade dress and a likelihood of confusion, the Court need not address First Brands' functionality defense.

and Recommendation in all respects. Plaintiff's motion for a preliminary injunction is denied. The parties are directed to appear at a status hearing on January 7, 1992 at 9:30 a.m. to report on how the case will proceed. Turtle Wax must be prepared to report specifically on what additional evidence it would present at a trial of this matter to establish that its Liquid Crystal trade dress is protectable in light of the Court's analysis set forth above. Absent a proffer of additional evidence, the Court concludes that additional proceedings in this case would be pointless and that judgment should be entered in favor of defendant. *See Saukstelis v. City of Chicago,* 932 F.2d 1171, 1174 (7th Cir.1991); *Chicago Observer, Inc. v. City of Chicago,* 929 F.2d 325, 329 (7th Cir.1991).

### APPENDIX A

### REDACTED COPY

TO: HONORABLE ILANA D. ROVNER, JUDGE UNITED STATES DISTRICT COURT

HONORABLE JUDGE:

REPORT AND RECOMMENDATION
of Magistrate Judge Ronald A. Guzman
PROPOSED FINDINGS OF FACT

*Nature of The Action and Parties*

This is an action for trade dress infringement in which Turtle Wax, Inc. ("Turtle Wax"), based upon its trade dress[1] for its Liquid Crystal polish, seeks to preliminarily enjoin First Brands Corporation's ("First Brands") trade dress for its Simoniz Ultimate waxes, pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. 1125(a), Ill.Rev. Stat.Ch. 121½, ¶ 312 (Illinois Deceptive Trade Practice Act) and ¶ 261 *et seq.* (Consumer Fraud and Deceptive Business Practices Act), and Illinois common law of unfair competition and trademark infringement. First Brands has denied that its trade dress is misleading or deceptive and has asserted the affirmative defenses of

unclean hands and functionality. First Brands also has counterclaimed for false advertising in violation of the Lanham Act, the Illinois Unfair Business Practices Act, and Illinois common law of unfair competition.

From December 17 through December 21, 1990, I conducted an evidentiary hearing. After having reviewed the pleadings, arguments of counsel, observing and studying the demeanor and credibility of the witnesses, and weighing and considering their testimony, I hereby make the following Findings of Fact and Conclusions of Law:

*Plaintiff*

Turtle Wax is a privately-held corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois. (Trial Transcript (hereinafter "Tr.") at page 17; Complaint ¶ 1) Turtle Wax is a manufacturer of various automotive, shoe, and metal polish products including automobile waxes, polishes, cleaners, and washes. (Complaint ¶ 6) One such product is an automotive polish called Liquid Crystal.

*Defendant*

First Brands is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Danbury, Connecticut. (Complaint ¶ 2) First Brands became a corporate entity in 1986 as the result of a leveraged buy-out from Union Carbide. (Tr. 510, 516) Union Carbide created the Prestone brand of car polish some time before 1973, and purchased the Simoniz brand in 1976. (Tr. 516, 719) In 1986 Union Carbide purchased the STP brand. (Tr. 722) First Brands acquired the Prestone, Simoniz, and STP brands pursuant to the leveraged buy-out in 1986. (Tr. 722) First Brands is now also engaged in the manufacture, marketing and sale of automotive appearance and general car care products under these

---

**1.** "Trade dress" is a commonly used term in the law of unfair competition which denotes the form in which a producer presents his brand to the market; thus a label, a package, even the

cover of a book might be trade dress. *Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.,* 781 F.2d 604, 608 (7th Cir.1986).

brand names. First Brands is a direct competitor of Turtle Wax.

*Background Of Auto Wax Industry*

Auto waxes and polishes comprise a major portion of the auto appearance products which are typically sold through retail outlets such as mass merchandisers, automotive chains, automotive specialty stores, grocery stores, and drug stores. (Tr. 749–50) The auto wax business is a slow-moving business which is very competitive for shelf space (Tr. 723) because the average purchaser makes only one purchase a year, and the typical container will yield three to four uses. (Tr. 91–92, 723) Because of the slow-moving nature of auto wax products, approximately 20–25% of the products are eliminated each year from the shelves. Competitors fight for new shelf space because the pre-season initial stocking order may be more business than they would receive for the rest of the year. (Tr. 724)

Paste auto wax products have for many years typically been sold in round cans (Tr. 747) and for over fourteen years these paste cans have utilized overcaps for storing sponges to give the product added value. (Tr. 747) Similarly, for over 30 years F-style cans have been used in regard to the sale of liquid auto waxes. (Tr. 742) In 1973, liquid auto waxes were sold almost exclusively in F-style cans. Among these, DuPont's No. 7 (Defendant's Exhibit (hereinafter "DX") 47) was the auto category leader Union Carbide introduced Prestone Silicone Wax (DX 45) to compete against DuPont's No. 7. (Tr. 742)

In the mid–1970's Rain Dance introduced an up-scale packaging for a liquid wax, placing the F-style can inside of a shadow box which allowed the display of a portion of the F-style can, and also supplied a sponge for added value. (Tr. 742–743, DX 61) The sponge was held in place on top of the can by the cardboard box (rather than by the use of an overcap). Competitors followed Rain Dance's lead and placed their F-style cans in cardboard packaging with cut-outs to initially expose part of the F-style cans, and also to expose the sponges supplied with the waxes. (Tr. 742–43)

Eventually, some competitors decided it was no longer necessary to have expensive shadow boxes so they resorted to simple cardboard boxes. (Tr. 743) Currently, due to public concerns about ecology and the environment, major mass merchandisers are pressuring manufacturers to stop use of unneeded cardboard packaging. (Tr. 743)

*Turtle Wax's Development Of The Liquid Crystal Product Package*

In the spring of 1986 Turtle Wax became interested in entering what it describes as the super premium wax market. (Tr. 64) At that time, Turtle Wax did not offer such a product as part of its overall automotive product line. (Tr. 195) At that time there were only limited competitors in this high-end market for car polishes, and their share of the market constituted an extremely small segment (Tr. 66, 195), so to some extent, Turtle Wax was looking to develop a somewhat untapped market.

Turtle Wax was aware of the presence of Liquid Glass auto polish in an F-style can that sold at retail for $15.00 to $17.00, and Mother's auto wax that was sold in a round paste can for $15.00 to $17.00. (Tr. 66–67, 195)

Liquid Glass was sold in a F-style can which had a gold background with the trademark Liquid Glass in black letters prominently displayed at the top of the front display panel. Directly below the Liquid Glass trademark were the words "Ultimate Auto Polish/Finish". Below that was a picture of a 1964 red Corvette. (DXs 87, 180)

In 1986, Turtle Wax's art department began drafting designs for the proposed Liquid Crystal trade-dress. (Tr. 18, 196) Turtle Wax's art department was directed to develop a package or trade-dress that would communicate the high-end, super-premium look for Liquid Crystal. (Tr. 195–196) Furthermore, Turtle Wax management has instructed the art department that the overall graphic appearance and color combination of Liquid Crystal was to be incorporating a black background, rich gold lettering, and elements of red and white to accentuate the other colors and

overall appearance. (TR. 196–97) It was also decided that the front of Liquid Crystal would contain a sleek-looking, upscale, high-tech automobile. (TR. 197, 204) This color and graphic combination was done specifically to enhance the super-premium, high-end, upscale look of Liquid Crystal. (Tr. 196–97)

Turtle Wax then decided to test-market their Liquid Crystal. This was to be done initially through the direct mail market. The direct mail Liquid Crystal package had a black background, gold lettering, red striping and an automobile on the front panel of the F-style can. (Tr. 19–21, Alberta Antweiler Deposition Exhibit (hereinafter "Ant.Ex.") D) It did not have an overcap. It did have and still does have the words in gold lettering "Ultimate 'Stop and Stare' Automobile Polish". (Tr. 205–06; Antweiler Ex. D) Turtle Wax currently has the phrase 'Stop and Stare' federally registered, with a federal registration pending for "The Ultimate Stop and Stare Automobile Polish". (TR., DX. Nos. 117–18). Turtle Wax chose that package because its color combination and graphic layout portray a very high quality, upscale, rich-looking package. Turtle Wax knew the product would be selling at a super-premium price level, and wanted the package to convey that image. (Tr. 21)

Turtle Wax chose the F-style can as opposed to another shape based on its belief that the F-style can would project the high-quality image of the product. The F-style can's weight and overall high quality appearance accomplished that objective. (Tr. 21–22) Turtle Wax also chose gold colored trim for the "rims" or "chimes" for the F-style can at extra cost to itself because that color would help connote the upscale image of the product. (Tr. 22)

As part of their test marketing plan, Turtle Wax decided to market the Liquid Crystal product as being produced by Plastone Co. rather than a Turtle Wax product because the Turtle Wax brand is associated with low-priced automotive products, unlike the super-premium priced image they sought for the Liquid Crystal product. (Tr.

23) The name of the producer, Plastone Co., appears only on the back of the Liquid Crystal can in very small lettering.

The Turtle Wax art department produced the color drawings for Liquid Crystal and incurred additional expenses in typesetting for the Liquid Crystal package. (TR. 18–19, 198–200; TR. 202–04) Turtle Wax spent a substantial amount of time and effort in developing and packaging the Liquid Crystal trade-dress. (TR. 20–22, 200–05)

Although there were at this time no substantially similar packages for "premium" quality car waxes, it is also true that the elements of the Liquid Crystal packaging, taken separately, were not new. As pointed out above, F-style cans had been in use for automobile polishes for some time. Again as pointed out above, at one time in the 1970's F-style cans were very popular for automobile polishes. That popularity then seemed to wane. Even so, there was at least one high priced automobile polish/wax on sale at the time of Liquid Crystal's development and marketing which was packaged in an F-style can, had an automobile on the front, and utilized the colors black and gold, although in a substantially different way. This product was, as pointed out above, Liquid Glass. So that although the Liquid Crystal trade dress as first developed was unique in the sense that there was no other package exactly like it, its individual elements were not unique, nor was the concept of a premium quality car polish or wax.

On cross examination, both Mr. Tornabene and Mr. Broderick of Turtle Wax were shown numerous products with many different shapes, sizes, colors, materials and contents. (TR. 104–116, 120, 307–13; DX. Nos. 5–91A, 199–200, 92–97, 102–109, 111–118, 126–29) For example, both witnesses were shown products ranging from insecticides, lacquer, wheel cleaners, fuel additives, turpentines, anti-freezes, wood solvents, gas cleaners, lighter fluids, charcoal lighters, paste removers, antique oils and even some automotive polishes and waxes. (TR. 104–116, 120, 307–13, 639–43) Some of those individual products, by them-

selves, had black backgrounds, some had yellow backgrounds, some had blue backgrounds, some were in plastic bottles, some were in metal F-style cans, some had an automobile on the package, only a few had overcaps, and some had a bit of red or gold in of their package. (TR. 104–116, 120, 307–13).

As the court understood it, the purpose of this exercise was to demonstrate that the individual elements which make up the entire Liquid Crystal trade dress (i.e., a black background, or F-style can) are *by themselves* common and functional, rather than distinct and arbitrary. However, in all of these products presented by defendant, not one single product possessed *all* of the elements in combination as contained on the entire Liquid Crystal package and trade dress. (TR. 104–116, 120, 307–13, 639–43). The product which came the closest by far, however, was defendant First Brands' own Simoniz Ultimate product. (TR. 415–18, 640–45; DX. Nos. 56, 199)

There was also evidence introduced by First Brands concerning the fact that use of the color black (the Liquid Crystal can contains a deep black background) is common, popular and thus necessary to compete effectively in the car wax and polish market. (TR. 550, 590–93, 665–75) Yet both Mr. Haglund and Mr. O'Brien of First Brands admitted that the current top three sellers in the automotive polish and wax market are Turtle Wax Super Hard Shell, Raindance and Nu Finish. (TR. 636–638, 759–61) None of those products, which account for approximately 62% of total sales in that market, has a black background. (TR. 637–38, 759–61; PX. Nos. 110, 116, 145) Turtle Wax Super Hard Shell has a yellow and green background, Raindance has a blue background, and Nu Finish has a bright orange background. (TR. 634–38, 750–61) In fact, defendant's own Simoniz brands are marketed primarily in yellow and blue. (TR. 760–761) Moreover, as Mr. Haglund testified, colors used in car waxes and polishes could conceivably "cover the rainbow". (TR. 760). None of these three top selling brands however, are in the premium category into which Liquid Crystal seeks to project itself.

Finally, there was testimony from Turtle Wax representatives that use of the overcap on the F-style can was not necessarily the most effective or convenient way, but was merely one approach to selling the Liquid Crystal product. (TR. 101–105; 225–26)

In February of 1987 the direct mail Liquid Crystal product was offered for sale in two regions of the country at two different price levels: $24.95 and $14.95. (Tr. 25, 68) There was only one advertisement which promoted this product by direct mail. The ad was in black and white, and ran only in the February 1987 issue of Hot Rod magazine. (Tr. 79; DX 97) The response to this advertisement was very poor with only 62 cans being sold. (Tr. 71; DX 96) Consequently, Turtle Wax terminated its sales of the direct mail Liquid Crystal product in the summer of 1987. (Tr. 25–26)

Also during the summer of 1987, Turtle Wax conducted an in-store test of Liquid Crystal sales. This test was limited to five auto stores in the Chicago market area. (Tr. 26–27) The results of this test were extremely positive and some shelves were restocked more than once. This particular marketing procedure was discontinued because Turtle Wax simply did not have the sales force to continue to market the product in this way. Sales of Liquid Crystal were discontinued in the auto test market in the fall of 1987, and thereafter there were no sales of Liquid Crystal in the United States for over two years; not until February and March, 1990. (Tr. 74–75) The above facts indicate that at that test marketing stage, there was no evidence of customer recognition due to Turtle Wax's efforts to testmarket Liquid Crystal.

From the fall of 1987 until the summer of 1988, the Liquid Crystal project lay dormant. (Tr. 27) Charles Tornabene, president of Turtle Wax's Consumer Products Division, then made a sales call on Canadian Tire, Canada's largest automotive products retailer. (Tr. 27) Canadian Tire expressed an interest in marketing a super-premium car polish product. Turtle Wax

then proceeded to resurrect the direct mail Liquid Crystal product by converting it into a product for sale at retail. The new version of Liquid Crystal would meet Canadian Tire's desire for a high-end, premium priced car polish product. Mr. Tornabene said that the Canadian tire market presented a great opportunity to increase sales in the high-end segment of the automotive polish market. Canadian Tire approved samples of the Liquid Crystal package, and agreed to distribute the product in its stores. (Tr. 27–28)

Around July of 1988, Turtle Wax began revamping the direct mail Liquid Crystal package for sales exclusively to Canadian Tire. (Tr. 28–29) The colors and graphics of the direct mail Liquid Crystal package remained basically the same for the Canadian package. (Tr. 29–30)

Liquid Crystal is, and continues to be, very successful in Canada. (TR. 31–33, 274–75) Through October of 1990, total sales of Liquid Crystal through Canadian Tire were [ ].[2] (TR. 33; PX. No. 104) Furthermore, as a single product, Liquid Crystal accounted for [ ][3] of Canadian Tire's total dollar sales in automotive appearance products. (TR. 31, 274–75) Canadian Tire is Canada's largest retailer of automotive appearance products, and in that capacity has over 60% of the automobile wax and polish market. (TR. 31, 274–75) Turtle Wax also manufactures a paste version of the Liquid Crystal product for sale in Canada. Retail sales in Canada of the liquid and paste versions of the Liquid Crystal product were first made sometime in February or March of 1989. (Tr. 30–31)

In October of 1988, Turtle Wax decided to begin preparing the Liquid Crystal prod-uct for distribution in the United States. (Tr. 75–76) In the spring of 1989, Turtle Wax revised the Canadian Liquid Crystal product package to develop a product for U.S. introduction. The super-premium segment of the U.S. car appearance products market was very small in terms of market share, but volume sales were accelerating. (Tr. 34–36) Turtle Wax wanted to add to the Liquid Crystal product an applicator sponge which would be housed inside an overcap. (Tr. 36) An overcap with applicator sponge was not initially used in Canada, but after it was adopted for the U.S. version of the product, Turtle Wax subsequently revised the Canadian version to incorporate this overcap with an applicator sponge. (Tr. 57) Both Mr. Tornabene and Ms. Alberta Antweiler of Turtle Wax testified that the overcap was designed to be a "value-added" aspect to Liquid Crystal consumers, in the sense that the consumer received the overcap and sponge in addition to the product itself. (TR. 36, 209–10)

Moreover, the smoked gray overcap, through which the consumer could see the terry cloth sponge, added to the already sleek, super-premium, high-end look of Liquid Crystal. (TR. 36–38, 211–212, 278–79) The charcoal fine cell sponge was not just a typical sponge, but rather one which was overlaid with terry cloth so it was more upscale looking than other sponges consumers were accustomed to receiving. There was testimony to the effect that there were no such overcaps on the market for Turtle Wax to purchase. (TR. 37, 211, 279) Hence, in May of 1989, Turtle Wax employed an outside company, Prent Corporation, to manufacture, engineer and develop the mold for the overcap. (TR. 37, 211–12; PX. Nos. 5–6) The overcap was

---

**2.** Pursuant to a joint request, certain confidential information was redacted from copies of this Report and Recommendation. The Honorable Ilana D. Rovner has been provided with copies of the original Report and Recommendation, and the redacted Report and Recommendation. The original Report and Recommendation has been ordered under seal with the United States District Court for the Northern District of Illinois.

 [ ] indicates deleted text
 —— indicates text revision

**3.** Pursuant to a joint request, certain confidential information was redacted from copies of this Report and Recommendation. The Honorable Ilana D. Rovner has been provided with copies of the original Report and Recommendation, and the redacted Report and Recommendation. The original Report and Recommendation has been ordered under seal with the United States District Court for the Northern District of Illinois.

 [ ] indicates deleted text
 —— indicates text revision

thereafter designed and engineered by Prent Corporation at a substantial cost to Turtle Wax. (TR. 37, 279–280; PX. Nos. 5–6)

Additionally, whereas the Canadian product depicted a Camaro on the front of the package, Turtle Wax chose to replace that car with a gold Porsche on the U.S. package. They believed a gold Porsche portrayed a more upscale, high-quality image which corresponded better with the Liquid Crystal product's positioning in the United States market. Turtle Wax also added several product claims on the front of the Liquid Crystal package, such as "The World's Best Shine" and "Meets the Highest Standards of Quality and Performance". (Tr. 57, Ant.Ex.R.)

Alberta G. Antweiler was the employee at Turtle Wax primarily responsible for the development of the trade dress for the Liquid Crystal package in 1986 for direct mail in the United States, and for the revision of the packaging in 1989 for retail sales in the United States. (Tr. 36, 142) In June of 1989, Antweiler prepared a draft of the text to appear on the front and back side of the U.S. Liquid Crystal package (DX 111). Attached to this Report and Recommendation are handwritten notes that appear to have been made by Antweiler. (Tr. 327–328) [4]

These handwritten notes appear to recite product claims copied verbatim from competitor packaging or advertising. These included statements such as "the world's best cleaner" (DX 111, p. 00108) and "formula designed to meet the highest standards of quality and performance". (DX 111, p. 00110) Antweiler then added to the front panel of the packaging for Liquid Crystal in 1989 the phrases "The World's Best Shine" and "Meets the Highest Standards of Quality and Performance". (DX 111)

Turtle Wax first began promoting the Liquid Crystal product to the trade at the August, 1989 Automobile Parts and Accessories Association (hereinafter referred to as "APAA") show, presenting the product in floor and counter displays, and showing a video tape on a TV screen. The customized retail shelf displays had been independently designed specifically for Liquid Crystal. (TR. 50, 281; PX. Nos. 102–103) (Tr. 41, 77) (TR. 77–78) 32. The APAA show is the largest trade show associated with automotive appearance products. (TR. 41, 281) It provides Turtle Wax, First Brands, and other important players in the industry with an opportunity to meet with key customers and introduce to them new products. (TR. 41, 281)

Usually, these key customers are the high volume, mass-merchandising retailers such as K–Mart, Wal–Mart, Track Auto and other major automotive retail chains. (TR. 281–82) The success or failure of any new product, such as Liquid Crystal, may depend on how well it is received at the APAA show. (TR. 281–82) The APAA trade show runs for three full days, during which thousands of potential customers and retailers meet with companies to review their new products. (TR. 41–42) Both Turtle Wax and First Brands attended the August 1989 APAA show.

The TV commercial for the Liquid Crystal product prominently displayed the brand name Liquid Crystal. Not all of the frames showed the overcap on top of the Liquid Crystal F-style can. (Tr. 84; DXs 105, 124) Furthermore, each time the TV commercial referred to the Liquid Crystal product it mentioned the trademark Liquid Crystal. Nothing in the television commercial suggests that the public look for the F-style can, when purchasing the Liquid Crystal Product, or the combination of colors of black, gold and red other than the fact that the can shown in the commercial fits this description. (Tr. 85, 124) There was no direct and intentional attempt to draw the would-be consumer's attention to the packaging itself. The product cans are

---

**4.** One of Turtle Wax's employees stated that the handwriting could be Antweiler's. (Tr. 327–328) Comparison of the handwriting in Exhibit 111 with the handwritten note on Defendant's Exhibit 116 signed "Alberta" reflects the distinct possibility that they could have been written by the same person, particularly when attention is paid to the stylistic form of the words "to" and "the."

not always visible throughout the commercial; frames showing the product are interspersed with other material. (Tr. 84–85, 124) The TV commercials also appeared on cable TV for a six-week period starting in April 1990. (Tr. 51–52) The commercial ran on ESPN, Turner Broadcasting, U.S.A. Network, Nashville Network, MTV, VH1 and Financial News Network. (Tr. 51–52)

In 1990 Turtle Wax spent [ ][5] on cable TV advertising for Liquid Crystal products. (Tr. 293) By comparison Armor–All introduced for the first time an automotive wax under the Armor All trademark in 1988, and spent [ ][6] in advertising the new product on TV that year. (Tr. 81–82, 582). So that the advertising for Liquid Crystal, although substantial, was not massive or unusual for the industry. An independent advertising tracking agency listed the amount of money spent advertising car waxes for the first half of 1990 as: $1,170,000 for Liquid Crystal; $3,181,000 for Rain Dance; $1,663,000 for Nu–Finish; and $1,343,000 for Turtle Wax. (Tr. 581–82; DX 192)

Turtle Wax also included ⅔ page color ads that ran in the May and June issues of various "car-buff" magazines such as Hot Rod, Road & Track, Motor Trend, Car and Driver, Four Wheeler and Automobile. (TR. 46, 86, 294; PX. Nos. 100, 142) The ⅔ page color ad for Liquid Crystal, which ran in those magazines, displayed the Liquid Crystal product and trade dress, and also emphasized its high performance, super-

premium aspects. (TR. 47, 294–95; PX. No. 100)

Although all of the ads displayed the Liquid Crystal product and were intended to acquaint consumers with the look of the product so that they could locate it in the stores, (TR. 45–49) none of the commercials or adds made particular reference to a uniquely shaped can, distinctive color combination or any features of the Liquid Crystal product packaging. (Tr. 87–88) In contrast, a print advertisement for Liquid Glass auto polish, for example, emphasizes the product's trade dress by stating, "Liquid Glass is sold only in the gold can with a red Corvette on the face." (Tr. 88–89; DXs 155 and 156) For these print advertisements, Turtle Wax had the artist highlight the trademark "Liquid Crystal." (Tr. 87) Turtle Wax believed that it was particularly important for advertisements to convey the product's brand name in order to achieve customer recognition of the Liquid Crystal products. (Tr. 47) Also, as part of its ⅔ page color ads, Turtle Wax provided the Liquid Crystal purchasers with redeemable $3.00 coupons. (TR. 52) Turtle Wax spent approximately [ ][7] in 1990 on print ads for the Liquid Crystal products. (Tr. 294) In introducing a new product and a new company name, Plastone Co., Turtle Wax was introducing new names neither of which were familiar to the American public. (Tr. 80)

In addition to the television and print advertising and the trade show promotion,

5. Pursuant to a joint request, certain confidential information was redacted from copies of this Report and Recommendation. The Honorable Ilana D. Rovner has been provided with copies of the original Report and Recommendation, and the redacted Report and Recommendation. The original Report and Recommendation has been ordered under seal with the United States District Court for the Northern District of Illinois.
 [ ] indicates deleted text
 —— indicates text revision

6. Pursuant to a joint request, certain confidential information was redacted from copies of this Report and Recommendation. The Honorable Ilana D. Rovner has been provided with copies of the original Report and Recommendation, and the redacted Report and Recommendation. The original Report and Recommenda-

tion has been ordered under seal with the United States District Court for the Northern District of Illinois.
 [ ] indicates deleted text
 —— indicates text revision

7. Pursuant to a joint request, certain confidential information was redacted from copies of this Report and Recommendation. The Honorable Ilana D. Rovner has been provided with copies of the original Report and Recommendation, and the redacted Report and Recommendation. The original Report and Recommendation has been ordered under seal with the United States District Court for the Northern District of Illinois.
 [ ] indicates deleted text
 —— indicates text revision

customized Liquid Crystal floor and counter-displays were delivered to major Turtle Wax retail customers such as K–Mart, Wal–Mart, Track–Auto, etc., to assist in selling and promoting Liquid Crystal. (TR. 50–51, 285; PX. Nos. 102–103) In fact, since February of 1990, approximately 5300 of those retail displays have been distributed to major retailers throughout the United States. (TR. 53, 283–86) The displays have been very successful in helping to sell Liquid Crystal. (TR. 236) Although the displays do not emphasize the other elements of the Liquid Crystal product package, (DXs 106, 107), they do provide for prominent display of the actual product itself, which naturally results in the product package being prominently displayed under and over the trademark, Liquid Crystal. Turtle Wax does not charge its customers for those displays, but rather bears the cost of this promotional item itself. (TR. 53, 285–86)

Turtle Wax had also conducted a survey regarding the effectiveness of its TV ads for the Liquid Crystal products, and the survey results revealed that consumer recognition of the name "Liquid Crystal" was very high relative to the other automotive polish commercials against which it was tested. (Tr. 95–96)

Liquid Crystal has in fact been the most successful new product ever launched by Turtle Wax. (TR. 54, 297; PX. No. 91) Through October of 1990, Turtle Wax sold approximately [ ][8] units throughout the entire United States. (TR. 54, 298; PX. No. 104) Sales totaled approximately [ ][9] for Liquid Crystal in 1990 (TR. 54; PX. No. 104) and accounted for [ ][10] of Turtle Wax's entire company sales in 1990. (TR. 54–55, 297) Obviously, Liquid Crystal has become a major factor and contributor to the current and future success of Turtle Wax. (TR. 54–56, 295–98) To give these figures perspective, however, it is important to keep in mind that Liquid Crystal products for the year 1990 enjoyed a unit share of only 1%, and a dollar share of 2.6% of the market, according to A.C. Nielsen figures. (Tr. 429–430; DX 203)

The average retail price for automotive polish products is approximately $4.50 to $5.00 per unit. (Tr. 65, 522) The Liquid Crystal product retails at approximately $12 to $17 per unit, and therefore is a high-priced automotive polish product. (Tr. 65, 90) The total cost per unit to Turtle Wax for producing the liquid version of Liquid Crystal is [ ][11]. (Tr. 71–72; DX 94)

8. Pursuant to a joint request, certain confidential information was redacted from copies of this Report and Recommendation. The Honorable Ilana D. Rovner has been provided with copies of the original Report and Recommendation, and the redacted Report and Recommendation. The original Report and Recommendation has been ordered under seal with the United States District Court for the Northern District of Illinois.

 [ ] indicates deleted text
 ____ indicates text revision

9. Pursuant to a joint request, certain confidential information was redacted from copies of this Report and Recommendation. The Honorable Ilana D. Rovner has been provided with copies of the original Report and Recommendation, and the redacted Report and Recommendation. The original Report and Recommendation has been ordered under seal with the United States District Court for the Northern District of Illinois.

 [ ] indicates deleted text
 ____ indicates text revision

10. Pursuant to a joint request, certain confidential information was redacted from copies of this Report and Recommendation. The Honorable Ilana D. Rovner has been provided with copies of the original Report and Recommendation, and the redacted Report and Recommendation. The original Report and Recommendation has been ordered under seal with the United States District Court for the Northern District of Illinois.

 [ ] indicates deleted text
 ____ indicates text revision

11. Pursuant to a joint request, certain confidential information was redacted from copies of this Report and Recommendation. The Honorable Ilana D. Rovner has been provided with copies of the original Report and Recommendation, and the redacted Report and Recommendation. The original Report and Recommendation has been ordered under seal with the United States District court for the Northern District of Illinois.

 [ ] Indicates deleted text
 ____ Indicates text revision

The total per-unit cost to Turtle Wax for producing the paste Liquid Crystal product is [ ].[12] (Tr. 72–73; DX 95) Turtle Wax sells liquid paste Liquid Crystal products to its customers for [ ][13] per unit, resulting in a high profit margin to Turtle Wax. Retail stores also sell the product at a substantial mark up, which gives them a large incentive to sell the product. (TR. 91)

In 1991 Turtle Wax plans to spend at least as much as in 1990 [ ][14] in broadcast media advertising on major television network stations. (TR. 56; PX. No. 96) Virtually all major retailers who did not agree to purchase the Liquid Crystal product for 1990 are now picking up Liquid Crystal for the 1991 spring season. (TR. 56).

*First Brands' Adoption of Trade Dress For Simoniz Ultimate Auto Polish*

Sometime in late December, 1989, or early January of 1990, First Brands sought to increase its gross profit margin for their Simoniz products. At that time, it had a product known as Swirl & Haze Remover, which was used to correct scratches and swirls in finishes and had superior gloss and water beading characteristics. (Tr. 518; DX 91–A) Swirl & Haze was initially directed towards high income, older purchasers who were interested in auto "detailing".

In early May, 1990, North Castle Advertising presented First Brands with a marketing report ("North Castle Report")

which introduced First Brands to a concept called "Detailer's Choice". (TR. 524) North Castle had not been retained, nor was it compensated by First Brands for preparing the report. (TR. 365) That report mentioned Liquid Crystal as one of the products with which First Brands would be in competition. (TR. 367–68; PX. No. 110, p. 77) The North Castle Report also contained a handwritten drawing of the Liquid Crystal trade-dress as it was then being marketed and sold by Turtle Wax. (TR. 371; PX. No. 110, p. 76) This drawing included the language "The Ultimate Stop and Stare Automobile Polish". (TR. 371; PX. No. 110, p. 76) By that time, of course, Turtle Wax had already introduced Liquid Crystal at the August 1989 APAA show, at which First Brands was present. (TR. 41, 281) As suggested in the North Castle Report, First Brands selected the mark Detailer's Choice for this product, which was packaged in an F-style can with an overcap containing a premium sponge, small detailing brush, and a booklet regarding detailing. (Tr. 526–529)

Because Detailer's Choice was geared toward a narrow niche of purchasers, First Brands decided to come out with another product that would have a broader appeal towards a younger audience. (Tr. 532) This product became Simoniz Ultimate. The formula for Swirl & Haze was used as a base for formulating Simoniz Ultimate. In fact, Detailer's Choice and Simoniz Ultimate were basically the same product for-

**12.** Pursuant to a joint request, certain confidential information was redacted from copies of this Report and Recommendation. The Honorable Ilana D. Rovner has been provided with copies of the original Report and Recommendation, and the redacted Report and Recommendation. The original Report and Recommendation has been ordered under seal with the United States District Court for the Northern District of Illinois.

 [ ] indicates deleted text
 &#95;&#95;&#95; indicates text revision

**13.** Pursuant to a joint request, certain confidential information was redacted from copies of this Report and Recommendation. The Honorable Ilana D. Rovner has been provided with copies of the original Report and Recommendation, and the redacted Report and Recommendation. The original Report and Recommenda-

tion has been ordered under seal with the United States District Court for the Northern District of Illinois.

 [ ] indicates deleted text
 &#95;&#95;&#95; indicates text revision

**14.** Pursuant to a joint request, certain confidential information was redacted from copies of this Report and Recommendation. The Honorable Ilana D. Rovner has been provided with copies of the original Report and Recommendation, and the redacted Report and Recommendation. The original Report and Recommendation has been ordered under seal with the United States District Court for the Northern District of Illinois.

 [ ] indicates deleted text
 &#95;&#95;&#95; indicates text revision

mula (TR. 374–75) sold to the public under two separate product names. (TR. 374–75)

In the spring of 1990, First Brands contacted an outside graphic design firm and requested that the firm prepare a package design concept for Simoniz Ultimate. First Brands told the designer to create a package for a high-end wax, and to make the package flashy, so as to appeal to 18-to-25 year olds. The design firm was further told to use the trademark Simoniz Ultimate and to include the phrase "For The Show Stopping Shine" and certain product attributes such as "Easy To Use". The design artists were also instructed to place a flashy red sports car on the front panel and to include an overcap along with an F-style can. (TR. 344, 535) First Brands never told the design firm about or showed them the Liquid Crystal products. (Tr. 533–537)

The design firm then presented First Brands with a number of design considerations. (Tr. 538) First Brands liked the graphics on one board that had a blue background, but requested the design firm to substitute a black background. (Tr. 542) First Brands had been following a course of action in recent years of using black as a background color for its premium products. (Tr. 557, 727–731)

After selecting a package design, First Brands conducted a focus group study of the design. The results revealed that the various panels classified the Simoniz Ultimate product's proposed packaging as indicating a higher than moderately-priced wax, and most times in the premium-priced category. (Tr. 544–549)

The Simoniz name is prominently displayed on the top of the Simoniz Ultimate package's front panel. "Simoniz" appears in white against the package's black background. First Brands chose to display the SIMONIZ name in this prominent manner because of positive focus group feedback indicating that the Simoniz name is associated with premium, high quality products. (Tr. 549–51, (Plaintiff's Exhibit (hereinafter "PX") 127)

First Brands' packaging department determined from the start that the product had to be packaged in a metal can, because the Simoniz Ultimate formula contained low volatile chemicals which were difficult to hold in plastic containers. The only choices for those containers (other than the round tub cans) were F-style cans and a 16 oz. cylinder with a cone top. First Brands opted for the former because it had substantial prior experience with F-style cans. (Tr. 528–529)

As presented to First Brands' sales force, the Simoniz Ultimate sales strategy for getting its product on the shelf was to attack Armor–All's waxes as a weak link in the automotive wax market. (Tr. 570) Armor–All's market share had drastically dwindled in the last three years from a 20% share to a 7% share. (Tr. 570–571) First Brands' sales force was instructed to ask retailers to replace Armor–All's wax product with Simoniz's new Simoniz Ultimate product for 1991. (Tr. 570) In June of 1990 First Brands conducted an internal brand review as a method of presenting the Simoniz Ultimate product to a potential target market. (TR. 376, 544) As demonstrated by the brand review document, Plaintiff's Exhibit 116, there is little doubt that First Brands was positioning or aiming Simoniz Ultimate directly at Liquid Crystal's ultimate customers. (TR. 378, 365) Plaintiff's Exhibit 116 at p. 111 states:

POSITIONING: [SIMONIZ ULTIMATE] PROVIDES A HIGH END CAR WAX TO HEAVY WAX USERS WHO MAY HAVE BEEN ATTRACTED TO Liquid Crystal PRODUCT....

As indicated above, First Brands had decided to use an F-style can, with a black background, an upscale automobile on the front, with a smoked gray overcap and terry cloth sponge. (TR. 379) No other automotive waxes or polishes in the marketplace at that time possessed all of these basic design elements, other than Liquid Crystal. (TR 379) As part of this process, defendant First Brands in July of 1990 obtained a sample of the terry cloth sponge from the Liquid Crystal product to use in packaging Simoniz Ultimate. (TR 387) Plaintiff's Exhibit 138, a July 17, 1990 in-

ternal memo from John O'Brien of First Brands states:

"Dear Greg:

Enclosed please find a terry cloth sponge that is currently being used by Turtle Wax. This fits into the overcap you currently have as a sample.

Please investigate the availability of this sponge as marketing would like to use this type in both AS973 and AS920." (TR 387; PX. No. 138)

The sample overcap referred to by First Brands in Plaintiff's Exhibit 138 was also obtained by First Brands from Liquid Crystal. (TR. 387) First Brands thereafter chose to use the same smoked gray overcap for Simoniz Ultimate. (TR 389, 391)

On August 7, 1990, Mr. John O'Brien then arranged for delivery to the First Brands packaging department of a full case of Liquid Crystal for "testing." (TR. 391–92) An internal memo on that date from the packaging department to Mr. O'Brien reads:

"You are to arrange for the Packaging Department to receive a full case of Liquid Crystal to allow transit testing of the similar overcap design." (TR. 392; PX. No. 105)

The packaging department of First Brands did in fact receive the case of Liquid Crystal from Mr. O'Brien. (TR. 392–93) The packaging department was in charge of the physical development, packaging and look of Simoniz Ultimate. (TR 392–93)

A Turtle Wax internal memo, First Brand's Exhibit No. 105, demonstrates that rather than using a black opaque overcap defendant instead specifically chose as its first choice a "translucent gray overcap", the same type being used on Liquid Crystal. (TR. 392; PX. No. 105)

On August 14, 1991, Mr. O'Brien called Mr. Hann of First Brands' packaging department and instructed him to make the can "chimes" or "lips" (i.e., beading around top and bottom of the F-style can) of Simoniz Ultimate the same gold lacquer color used on Liquid Crystal. (TR. 393–94; PX. No. 137) Plaintiff's Exhibit 137, an Au-

gust 14, 1990 internal telephone-call memorandum from Mr. O'Brien to Mr. Hann reads:

"Regarding AS–991 [Simoniz Ultimate Liquid], can chimes, color same as Liquid Crystal, gold lacquer." (TR. 394)

The above facts clearly indicate that First Brands targeted Liquid Crystal, and the concept of the flashy premium polish that it represented, for direct competition with its Simoniz Ultimate. There is also no doubt in my mind that the defendant intentionally copied and emulated many of the design components, e.g., color combination and graphics of the Turtle Wax product.

At the September 1990 brand review, First Brands again specifically targeted Liquid Crystal with its Simoniz Ultimate product. (TR 400–01; PX. No. 118) In fact, First Brands' sales force was informed that Liquid Crystal was gaining trade and consumer support. (TR. 400, 634)

The Simoniz Ultimate products that First Brands apparently intends to market and distribute are contained in Defendant's Exhibits 56 and 199. (TR. 395) In response to Turtle Wax's concerns, First Brands changed the color of the overcap from translucent gray to black opaque. (TR. 398) It did not change the F-style can or the design of the overcap, just the color. First Brands also removed the previous red stripe on the top of Simoniz Ultimate, and minimally enlarged the Simoniz name. (TR. 398) In spite of these changes the overall appearance and image of Simoniz Ultimate retains substantial similarity to Liquid Crystal although, as we will see below, with significant differences as well.

Production and distribution for the Simoniz Ultimate liquid was scheduled to commence, at the earliest, December 21, 1990, while production for the paste version was scheduled for the first week of January, 1991. (TR. 402) It is planned that Simoniz Ultimate will be distributed to the same major retail outlets where Liquid Crystal is currently being sold. (TR. 53, 402–03, 606) Simoniz Ultimate will also retail at approximately $6.99 (as compared to $14.00 to $16.00 for Liquid Crystal), and

is without doubt a "competitive product" to Liquid Crystal. (TR. 402–404, 58–60)

First Brands further indicated that it intends to conduct extensive print advertising, media advertising, and promotional activities for Simoniz Ultimate commencing July 1, 1991. (TR. 405–06) The total budget for those activities will be (about the same as Liquid Crystal's advertising for 1990).[15]

*Expert Testimony Regarding the Likelihood of Confusion*

Turtle Wax's expert, Dr. Jacob Jacoby, testified at length concerning his impressive credentials, which include numerous degrees, awards, and professional organization memberships. (TR. 150–58; PX. No. 101—Dr. Jacoby's Curriculum Vitae) Dr. Jacoby is an expert in consumer research and behavior, and has published over 130 articles in prestigious journals in that area. (TR. 158)

Dr. Jacoby stated that he had not been asked to conduct a survey on the secondary meaning behind the Turtle Wax product. (Tr. 172) Further, he testified that he did not conduct a likelihood-of-confusion survey concerning Liquid Crystal and Simoniz Ultimate in part because as the Simoniz Ultimate product was not yet being marketed or sold, the only products available with which to conduct a survey were a few Simoniz Ultimate "mock-ups", which are not the product as it would actually appear on shelf to the consumer, and in part because of the short-time frame of this litigation. (TR 166–67).

Dr. Jacoby testified that a consumer could be mistaken or confused with respect to a product's trade dress in three separate ways. (TR. 163) The first type of confusion is "brand-level confusion", which means that the consumer could believe Product A was Product B. (TR. 163) The second type is "source-confusion", which

means the consumer could believe the two products, because of their similarities, emanate from a common source. (TR 163–164) Lastly, "sponsorship or authorization confusion", which means that although the consumer understands two products to be separate, the consumer nonetheless understands or believes that, because of product similarities, one firm is sponsoring another firm's product. (TR 164)

Dr. Jacoby, based upon his extensive experience and credentials, expressed an opinion that there was a potential for confusion between the two products (TR 165, 168), either "brand-level" confusion, in that consumers would believe that Simoniz Ultimate was Liquid Crystal, or vice versa (TR. 167–69), "source-confusion" because of the similarities, emanating from a common source. (TR 168)

Dr. Jacoby based his opinion on numerous factors. First, that both products are sold through the same channels and retail outlets, in the same sections, and for the same purposes, i.e., automobile polishes and waxes. (TR. 169) In addition, that the entire appearance of the Liquid Crystal and Simoniz Ultimate products was virtually identical in terms of shape, configuration, color combination, graphics, similarity in language on the cover, and underlying meaning of the words. (TR 169)

Dr. Jacoby also testified that advertising of Liquid Crystal would enhance the potential for a likelihood of confusion. (TR 170) Advertising of the Liquid Crystal product would necessarily provide a higher customer awareness of the overall appearance or "gestalt" of the Liquid Crystal, and thus further cause likelihood of confusion with Simoniz Ultimate. (TR 170)

Dr. Jacoby had not researched the automotive appearance products marketplace, had not gone to any stores, nor had he talked to any consumers. Further, Dr. Jacoby does not wax his own car and has not

**15.** Pursuant to a joint request, certain confidential information was redacted from copies of this Report and Recommendation. The Honorable Illana D. Rovner has been provided with copies of the original Report and Recommendation, and the redacted Report and Recommendation. The original Report and Recommendation has been ordered under seal with the United States District Court for the Northern District of Illinois.

[ ] indicates deleted text
____ indicates text revision

done so in the last ten years. (Tr. 175–176) When shown Armor All's protectant and Turtle Wax's protectant (DXs 13, 14) products for comparison, he stated that he considered the trade dress similar and that there existed a <u>potential</u> for likelihood of confusion in these products as well. However, in order to determine whether there would be a likelihood of confusion, he said, he would need to conduct a survey. (Tr. 180)

## DISCUSSION

Turtle Wax contends that First Brands' improperly appropriated its Liquid Crystal trade dress under section 43(a) of the Lanham Act, 15 U.S.C. 1125(a) (1982); Ill.Rev. Stat. Ch. 121½, para. 312 (Illinois Deceptive Trade Practice Act) and para. 261 *et seq.* (Consumer Fraud and Deceptive Business Practices Act), and Illinois common law of unfair competition and trademark infringement. Therefore, Turtle Wax seeks a preliminary injunction to prohibit First Brands from using its current trade dress for its Simoniz Ultimate Car Wax.

The purpose of a preliminary injunction is to minimize the hardship to the parties pending the ultimate resolution of the lawsuit. *Faheem-el v. Klincar*, 841 F.2d 712, 717 (7th Cir.1988) To support the issuance of a preliminary injunction Turtle Wax must demonstrate the following: (1) A reasonable likelihood of success on the merits; (2) the inadequacy of a remedy at law; (3) the existence of irreparable harm without the injunction; (4) that the threat of harm to the plaintiff outweighs any harm to the defendant if the injunction were issued; (5) that the public interest would not be disserved if the litigation were granted. *Somerset House, Inc. v. Turnock*, 900 F.2d 1012, 1014–15 (7th Cir.1990). Though "[t]he plaintiff must satisfy each of these elements to prevail," *Id.*, at 1015, his threshold burden is to show the first three factors. *Ping v. Nat'l Edu. Ass'n*, 870 F.2d 1369, 1371 (7th Cir.1989). "Only once this burden is met does the inquiry become a 'sliding scale' analysis of the harm to the

parties and the public from the grant or denial of the injunction, and the actual likelihood of success on the merits." *Id.*

## LIKELIHOOD OF SUCCESS ON THE MERITS

If a seller adopts a trade dress confusingly similar to a competitor's protected trade dress, this is considered unfair competition and is actionable under section 43(a) of the Lanham Act. *Vaughan Manufacturing Co. v. Brikam International*, 814 F.2d 346, 348 (7th Cir.1987). However, before a manufacturer can sue for trade dress infringement, its trade dress must be protectable. Therefore, for Turtle Wax to be successful on the merits of its injunction case, it must establish that its trade dress is protectable. To do this Turtle Wax must establish (1) that its Liquid Crystal trade dress is "inherently distinctive" or has acquired a "secondary meaning" to consumers, *Vaughan Manufacturing Co. v. Brikam International*, 814 F.2d 346, 348 (7th Cir.1987); *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 608 (7th Cir. 1986); and (2) that the First Brands Simoniz Ultimate Car Wax trade dress creates a likelihood of confusion on the part of consumers as to the source of that product. *Blue Coral, Inc. v. Turtle Wax, Inc.*, 664 F.Supp. 1153, 1160 (N.D.Ill.1987).[16]

## A. LIQUID CRYSTAL'S INHERENTLY DISTINCTIVENESS

Two different tests have generally been adopted in analyzing the issue of inherent distinctiveness. The first test is the Chevron Test as set out in *Chevron Chemical Co. v. Voluntary Purchasing Groups*, 659 F.2d 695 (5th Cir.1981). The second test is the Seabrook Test from *Seabrook Foods Inc. v. Bar-Well Foods Ltd.*, 568 F.2d 1342, 1344 (C.C.P.A.1977). Each of the two tests have been applied to the facts in the case at bar. My conclusions with respect to the application of these two tests are as follows:

### The Chevron Test

The principal rule of protectability of inherently distinctive trade dresses in the

---

**16.** Citing *Horn Abbott Ltd. v. Sarsaparilla Ltd.,* 601 F.Supp. 360, 365 (N.D.Ill.1984).

absence of secondary meaning was established in *Chevron Chemical Co. v. Voluntary Purchasing Groups,* 659 F.2d 695, 702 (5th Cir.1981), (cited with approval by the Seventh Circuit in *Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.,* 781 F.2d 604, 608 (7th Cir.1986). In *Chevron,* the plaintiff was unable to prove secondary meaning for a particular trade dress despite the fact that the product had been on the market in the dress trade for over five years. The court there held that the trade dress of Chevron's product was a common law trademark, and found that the colors of the trade dress presented in Chevron's particular geometric pattern created a distinctive visual impression. *Id.* at 703. The court then concluded that a trade dress which was "arbitrary and serve[d] no function either to describe the product or assist in its effective packaging," *Id.* at 702, would be protectable even in the absence of a finding of secondary meaning.

Under this holding then, the elements which must be established are: 1) that the trade dress is "arbitrary," and 2) that the trade dress serves no function to either describe the product, or assist in its effective packaging. Applying these legal principles to the facts I find that the Liquid Crystal trade dress is not inherently distinctive within the meaning of the law as delineated in the *Chevron* case. The testimony, as spelled out in the factual findings above, is overwhelming that the trade dress of Liquid Crystal overall, and element by element, is meant to be functional either in describing the product or in effectively packaging it. A term or feature is descriptive if it specifically describes a characteristic or an ingredient of a product. *A.J. Canfield Co. v. Vess Beverages,* 796 F.2d 903, 906–07 (7th Cir.1986). The finding that the Liquid Crystal can, color combination, gold chimes and smoked black overcap are descriptive and not arbitrary is based upon the representation that Liquid Crystal is, and is being sold as, a premium priced, high quality polish. Indeed much of the testimony given on behalf of the plaintiff in this case was to establish that their product is unique in that it is the very first entry into the premium polish market by a major company in the automotive appearance industry. That being the case, those aspects of the trade dress which tend to establish high quality and premium price are functional in that they serve to describe the product.

From the testimony of the Turtle Wax officers and employees themselves, I find that almost each and every element of the Liquid Crystal trade dress was carefully and intentionally chosen for its function in describing this product as a premium and expensive car polish. Turtle Wax could, for example, have chosen to market its polish as a high tech formula, as opposed to emphasizing its "premium" quality. If that were the case, the trade dress could be seen as purely arbitrary since there is nothing in the colors or symbols or even the type of can used (an arguably old fashioned, solid metal can) which would denote the high tech character of the product. Such was not the case here. Turtle Wax's own testimony was that this style packaging was sought because it conveyed an image of an expensive, upscale or premium product. The weight of the can and the substantial material (metal as opposed to something lighter or flimsier) were thought by Turtle Wax officers and planners to convey this image to the consumer and therefore be of value in selling the product. This is not an arbitrary symbol devoid of any meaning. The depiction of an automobile on the front of the Liquid Crystal can is also, of course, descriptive of the function of the product. Even in this, Turtle Wax sought to convey its "premium product" meaning when it decided to change the automobile on the label from a red Camaro to a gold-colored Porsche on the U.S. package. This was intended to give Liquid Crystal a more upscale, high quality image which corresponded better with its positioning in the market.

The problem from Turtle Wax's point of view, however, is that it can not claim the premium automobile polish market as its own. Its competitors have a perfect right to position their products in this manner as well, and to the extent that plaintiff's trade dress is descriptive of this particular quali-

ty of its product, the competition is entitled to utilize these same elements of color and style to describe the premium nature of their products as well. One particular portion of the voluminous testimony sticks out in this respect. The deposition of Alberta Antweiler, plaintiff's marketing manager on new automotive products, has the following testimony by Ms. Antweiler:

"Q Which leads to my next question: How and when did you decide on the color scheme and the graphics of the Liquid Crystal product?

A I had just come back from a trip to Europe that spring, and black, gold and red were the real hot colors in fashion and home decorating. And at the same time I was redoing my house, and I have redone my house in those colors also. And I thought those would be appropriate and almost necessary to use for a new product introduction of this kind ... those were the hot colors, and they communicated a very high-end look which was what I was trying to achieve with this product." (Tr. 196–197).

The above testimony indicates that at least one very instrumental employee considered the color combination of plaintiff's new trade dress to be "almost necessary" given today's fashion, to achieve a very high-end look. Surely Turtle Wax can not be given exclusive use within the auto polish industry of use of a color combination which, by its own admission is "almost necessary" to achieve a high end look. Turtle Wax can not own exclusive rights to the high end look in its market. That the overall trade dress was meant to convey a very specific meaning can not be doubted given the evidence in this case.

The use of terms such as "ultimate" and "stop and stare" are also, of course descriptive of product performance and in particular of the "premium" nature of this particular product. Even the gold color of the chime on the Liquid Crystal can was intended to project this particular meaning. Gold of course, is a color which has always been particularly associated with wealth and expense. We all know that gold is an expensive and precious metal.

Of course, it is the overall look which Turtle Wax seeks to protect here and which it urges the Court to consider as a whole in determining the issue of infringement. And if the overall look of its product were arbitrary and not meaningful or descriptive of its product, this case would be much closer. But Turtle Wax can not, when one after another of its witnesses testified as to the work which went into making the entire trade dress functional in describing the product, now ask the Court to ignore this and rule that its trade dress is arbitrary, unique and was not intended to serve any function. Nor can it lay exclusive claim to the use of the currently most fashionable colors for achieving a particular look. *Keystone Camera*, 667 F.Supp. 1221, 1226 (N.D.Ill.1987)

Functionality in effective packaging is also present. For example, the smoked grey overcap upon which Turtle Wax rests much of its claim of a unique and distinctive look, is a functional, environmentally desirable method of storing the applicator/sponge which is sold along with the wax. It is also not a new concept. Overcaps have been used on the round (tub) cans of polish for years. On F-style cans the use of an overcap may, at best, be a refinement of what Raindance was doing years ago with its cardboard containers. Even the sponge itself is a "value added" item which gives the consumer more for his/her money and is functional in the sense that it is used to actually apply the product itself. As is pointed out in the factual findings, the inclusion of a sponge is nothing new in the auto polish market. There was even some testimony that the overcap is useful in packing and stacking the product for shipment and was designed with this in mind.

The F-style can about which there was so much testimony is also functional. Testimony adduced by First Brands also established that a metal can was useful and maybe even necessary in packaging certain types of chemical products which were like-

ly to leak in non-metal containers. The can was also described as very functional in that it has a wide base and sufficient weight to allow the user to place it securely on the ground while otherwise engaged in applying the product and is of a shape that is easy to hold. The utility of this particular element of the trade dress is clearly established by the fact that it has been used for many years by a very large number of manufacturers of a large variety of automotive and non automotive products including car waxes. This element of the trade dress is neither arbitrary nor unique, but rather both functional and common. Other than possibly the addition of the overcap there is no change or alteration of the shape of the basic F-style can which has been in such common use for so many years in the American marketplace.

Thus, under the *Chevron* test, because so many of the elements of the trade dress are nonarbitrary and functional, I recommend that the Court find that the Liquid Crystal trade dress fails to qualify for trademark protection absent secondary meaning.

### The Seabrook Test

The Eleventh Circuit has adopted a different test to determine whether a trade dress is "inherently distinctive." *Am-BRIT, Inc. v. Kraft, Inc.*, 805 F.2d 974, 979 (11th Cir.1986), *review denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987); *Brooks Shoe Manufacturing Co. v. Suave Shoe Corp.*, 716 F.2d 854, 858 (11th Cir. 1983). In *Seabrook Foods, Inc. v. Bar-Well Foods Ltd.*, 568 F.2d 1342, 1344 (C.C.P.A.1977), the court set forth the key factors to consider when determining whether a design for a trademark is inherently distinctive. According to the *Seabrook* test the Court must determine whether it was a "common" basic shape or design, whether it was unique or unusual in a particular field, or whether it was a mere refinement of commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the

public as a dress or ornamentation for the goods. *Id.* at 1344.

Before applying this test to the evidence presented to the Court, we must decide how to define the "field" or "class of goods" to which Liquid Crystal belongs. Turtle Wax has presented its evidence in a manner which at least assumes that we should only consider automobile polishes and no other automotive appearance products. Turtle Wax presented an exhibit which represents a typical shelf display in a store for the sale of its product. This display included only automobile polishes. There were no other types of products on the shelf. On the other hand First Brands took every opportunity to question the uniqueness of the Liquid Crystal trade dress by comparing it to a wide range of automotive products other than polishes. There was also evidence that much of the displaying of Liquid Crystal was to be done in the custom displays which Turtle Wax prepared specially for it and distributed to many of its biggest customers such as K-Mart, Wal-Mart, Trak-Auto, etc. These counter and floor displays obviously would hold no other product of any kind, only Liquid Crystal. Where in relation to the other automotive appearance products these displays would be set up is open to question. There was however no evidence adduced to establish that Liquid Crystal will not be placed in any given store's automotive products section. There is no reason to believe that it will be placed by itself in a section which does not contain other automotive appearance products. The ultimate consumer therefore will be comparing the Liquid Crystal package to a wide variety of packages of both polishes and other automotive products when he or she scans the aisle looking for this product. Accordingly, I find that it is the automotive appearance chemicals as one group or class of goods which comprises the field or class of goods to which Liquid Crystal belongs and to which we must look in order to decide whether the trade dress is "inherently distinctive." [17]

17. In *Seabrook Foods, Inc. v. Bar-Well Foods Ltd.*, 568 F.2d 1342, 1345 (C.C.P.A.1977), the court indicated that for purposes of determining whether plaintiff's trademark on frozen fruits and vegetables was inherently distinctive it could look to third parties' use of the mark on

We must first determine whether the Liquid Crystal trade dress is of a common basic shape or design in the automotive appearance chemical field. I find that the basic shape and design of the trade dress is an F-style can with an overcap and the name of the product prominently displayed in bold lettering in the upper third of the can.[18] Further, there was testimony that past auto wax products, typically sold in tubs or round cans, have for over fourteen years utilized overcaps for storing sponges to give the product added value.[19] The factual findings also clearly indicate that F-style cans have been used on and off again in packaging liquid polishes for many years. Evidence was adduced that there have been in the past various automotive appearance products sold in F-style cans with an overcap.[20] Therefore, I am recommending that the Court find that the basic shape and design of the Liquid Crystal trade dress is common.

The same facts outlined above also support the conclusion that the Liquid Crystal trade dress is not unique in its field. It is rather a combination and refinement of elements already found in abundance in the field of automotive appearance products with which the consumer is confronted when he/she ventures into a store to shop for an automobile polish. As pointed out above, the much talked about smoked grey overcap is no more than a refinement of an already well known and used form of trade dress or ornamentation for automotive appearance products. The black background color is also very common as is the use of the color combination of gold, red and white on a black background. Even the name itself, "Liquid Crystal," contains elements already in use before this product came out. The same can be said for the symbol of an automobile on the front of the can, the use of words like "ultimate" and the positioning of the product name.[21]

After reviewing all of the evidence I recommend that the Court find that the Liquid Crystal trade dress is also not "inherently distinctive" under the *Seabrook Test.*

all frozen foods. Seabrook is cited to this same effect in *Blue Coral, Inc. v. Turtle Wax, Inc.*, 664 F.Supp. 1153, 1162 (N.D.Ill.1987), which is also in accord in holding that an automotive all purpose wheel cleaner is in the field of all automotive appearance products for purposes of judging the distinctiveness of its trade dress.

18. Liquid Crystal is also sold in the round tub version as a paste. In this regard however, the testimony is clear that round tubs with and without overcaps have been used for many years for automobile polishes in paste form. The Simoniz Ultimate tub is also smaller by two ounces than the Liquid Crystal tub. It is therefore clear that if any claim to uniqueness etc. exists, it is much stronger when considering the F-style cans as opposed to the tub cans. I will therefore limit my discussion to the two products in their F-style cans.

19. Auto waxes sold in round paste cans with overcaps containing sponges with black backgrounds, gold print, and splashes of red have been used for many years. (Tr. 117, 747) Examples of such products are K–Mart's Auto Wax (DX 76), Eagle 1 Wax (DX 157), and Kit Cleaner Wax (DX 131). Other paste products that are sold in round cans, have a black background and prominent gold or yellow lettering, two of which have overcaps, are ARMOR ALL paste

(DX 66); Meguiar's Deep Crystal (DX 78), Wynn's Classic Car Wax (DX 129), Reggie's Wax (DX 128), and Acrylic Kit (DX 67). In 1990, Meguiar's had 3% of the auto wax market (PX 116).

20. Overcaps containing a sponge have previously been used on F-style cans for auto appearance products. They were used on RALLY F-style cans for auto wax in the 1970's and on a prewax sold under the Blue Poly trademark in the late 1970's and early 1980's. (Tr. 744, 746; DXs 161, 202) In 1974 First Brands' predecessor was considering using an overcap containing a sponge on its Prestone Liquid Wax that was sold in an F-style can. (Tr. 746; DX 201). F-style cans with overcaps have been used in Europe for at least fourteen years. (Tr. 607–08; DX 162)

21. The Liquid Glass F-style can (in existence and being sold before LIQUID CRYSTAL) has a gold background with the trademark Liquid Glass in black letters prominently displayed at the top of the front display panel. Directly below the Liquid Glass trademark are the words "Ultimate Auto Polish/Finish." Below that a picture of a 1964 red Corvette appears. Liquid Glass is also sold as a premium automobile polish for a substantially higher price than ordinary polishes. (DXs 87, 180)

Thus, the Liquid Crystal trade dress will only be protectable as a trademark if it has acquired secondary meaning.

## B. SECONDARY MEANING

In determining secondary meaning, this circuit takes into consideration the following factors: (a) consumer testimony; (b) consumer surveys; (c) exclusivity, length, and manner of use; (d) amount and manner of advertising; (e) amount of sales and number of customers; (f) established place in the market; and (g) proof of intentional copying. *Echo Travel, Inc. v. Travel Associates, Inc.*, 870 F.2d 1264, 1267 (7th Cir. 1989); *Eldon Industries, Inc. v. Rubbermaid Inc.*, 735 F.Supp. 786, 816 (N.D.Ill. 1990).

Turtle Wax has presented no direct evidence that the Liquid Crystal trade dress has acquired a secondary meaning.[22] As detailed in the Findings of Facts sections of this Report and Recommendation, Liquid Crystal has not been on the market for a long period of time. After its short unsuccessful attempt at direct orders from magazine adds in February of 1987 it was sold for a short time in a small number of audio stores in the Chicago area during the summer of 1987. It was then abandoned until it was introduced into the Canadian market in February or March of 1989. Then in April of 1990, it was more or less "officially" introduced into the U.S. market in its present form.[23] It should be noted that the exact trade dress which Turtle Wax seeks to protect was not in existence until sometime in August of 1989. Prior to that such things as the smoked grey overcap and the color and make of the automobile shown on the package were either missing or different. This is a very short period of time in which to establish secondary meaning. *Keystone Camera Products Corp. v. Ansco Photo–Optical Products Corp.*, 667 F.Supp. 1221, 1231 (N.D.Ill.1987). *Echo Travel*, 870 F.2d at 1269.

Further, nothing in any of the Liquid Crystal advertisements during this short period of time called the consumers' attention directly to the product's trade dress. That is, the consumer was not directed to look for any particular distinguishing feature of the packaging when he/she went to the store to look for the product. Nor did any of the advertising direct the consumer's attention specifically to the packaging per se. Such limited advertising falls short of establishing secondary meaning. *First Brands v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir.1987).

Turtle Wax's only expert witness testified that he was not asked to conduct a survey on secondary meaning and gave no opinion on this subject. Finally, the product, Liquid Crystal, was not marketed or sold under the Turtle Wax company name, but under an entirely new name, Plastone Co., not known to the public. In spite of the fact that the public need not necessarily be aware of the identity of the producer in order to establish secondary meaning,[24] the likelihood of establishing such an association in the mind of the consumer between the trade dress Liquid Crystal and a previously completely unknown producer in a short period of time is much less than if the producer were a well-known name such as Turtle Wax.

The Seventh Circuit has indicated however, that proof of intentional copying is probative evidence of secondary meaning. *Vaughan Manufacturing Co.*, 814 F.2d at 349. As previously stated above I have

---

**22.** "Secondary meaning" denotes an association in the mind of the consumer between the trade dress of a product and a particular producer. *A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 907 (7th Cir.1986).

**23.** In August of 1989 it was introduced to the retailers of automotive appearance products in the annual APAA show. However it is secondary meaning in the minds of the ultimate consumer with which we are here concerned since

it is the ultimate user/consumer who may or may not be unfairly influenced by the trade dress of the competing product. At least this Court has heard no argument from either side that K–Mart or any of the other major customers of Turtle Wax is likely to be confused or led astray as to who they are purchasing their stock from.

**24.** *Roulo v. Russ Berrie & Co. Inc.*, 886 F.2d 931, 936 (7th Cir.1989).

concluded that the evidence of intentional copying is very strong in this case. The factual findings upon which I base this conclusion are spelled out above and I will not review them here. Suffice it to say, that there was documentary evidence and oral testimony that the Liquid Crystal trade dress was given to various departments of First Brands so that they might more successfully copy some of its elements in producing the Simoniz Ultimate trade dress.

However, in *Blau Plumbing*, Judge Posner made it clear that proof of intentional copying alone does not eliminate the need for additional proof of secondary meaning. *Blau Plumbing, Inc.*, 781 F.2d 604, 611 (citing *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 859–60 (11th Cir.1983)). Similarly in *Schwinn Bicycle Co. v. Ross Bicycles Inc.*, 870 F.2d 1176, 1183 n. 13 (7th Cir.1989), the Seventh Circuit makes it clear that while such evidence is probative of the existence of secondary meaning, it does not alone give rise to a presumption of secondary meaning. In the present case proof of intentional copying alone is all we have. There is no other evidence which even remotely suggests the existence of secondary meaning and there is, as I have indicated above, much evidence to the contrary.

After weighing and considering carefully the extensive testimony (summarized in my factual findings above) with respect to the nature and amount of advertising engaged in by Turtle Wax, the likely impact of such advertising on the consumer and the considerations listed above, I am convinced that the evidence does not reach that level necessary to establish even a more than negligible likelihood of success in establishing secondary meaning. I recommend that the Court so find.

In *Blue Coral, Inc. v. Turtle Wax, Inc.*, 664 F.Supp. 1153, at 1162 (N.D.Ill.1987) Judge Aspen spelled out the basic approach which I have borrowed in reaching this conclusion:

"Trade dress protection is much more extensive than trademark protection, 1 J.T. McCarthy, Trademarks and Unfair Competitions 8:1 (2d ed. 1984). Trademark protection is limited to comparing just one *1163 aspect of plaintiff's product with one aspect of the defendant's product, that is, the use of the trademarks. For trade dress infringement we are to compare the overall impression of the two trade dresses. The idea behind such extensive protection is to prevent a second comer from free riding on the first comer's efforts to win consumers. *Cf. Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1430 (7th Cir.1983). In order to insure that this extensive protection is properly used, the first comer has to prove the existence of secondary meaning. That is, that the consuming public had come to identify the first comer's trade dress with the first comer. This insured the evil sought to be protected against, free riding on another's efforts, was addressed. Obviously, if the consuming public had never come to associate the first comer's trade dress with the first comer, the consuming public would not be unfairly confused when the second comer put its product on the market even if that product was confusingly similar to the first comer's.

Later development of this doctrine allowed trade dress protection in the absence of secondary meaning if the first comer's trade dress was inherently distinctive. *See, e.g., Chevron Chemical Co. v. Voluntary Purchasing Groups*, 659 F.2d 695 (5th Cir.1981). This followed the case law for trademarks which allows protection of "inherently distinctive" trademarks upon first use. *Chevron*, 659 F.2d at 702. Such protection is granted to trademarks because the mark has no meaning absent the use by the originator of the mark. With trademarks it is fairly easy to determine what is an "inherently distinctive" trademark. For example, the use of Exxon or Kodak as a company name is "inherently distinctive". These are made-up words that had no meaning until a company decided to use them. Thus, if a second comer tried to use a name confusingly similar, it would be unfair competition. It is a

fairly simple process to compare one arbitrary made-up name with another arbitrary made-up name. The process is not that simple when it applies to comparing one trade dress with another. A complete trade dress can be made up of many different functional elements such as a bottle, a spray cap, and a label. It may also be made up of many descriptive elements such as pictures of the items the product cleans, as in this case wheels, or the descriptive use of high tech graphics to describe the modern advanced nature of the product. The trade dress may also incorporate truly arbitrary elements such as in the Wheel Magic trade dress the color of the packaging, the color of liquid, and the use of clear rather than an opaque bottle. Thus, we are to take these many varied elements and decide if together they create an inherently distinctive trade dress. This is not as easy of a process as comparing one arbitrary made-up word with another. Thus, in deciding whether a trade dress is inherently distinctive, we look at the overall impression of the various elements but we still must consider how unique this new compilation is in comparison to what is already in the field. This will necessarily encompass a consideration of the various elements, otherwise every trade dress would have instant protectability that exceeds even trademark protection. This protection would extend to aspects of a trade dress that if used as a trademark could not be protected absent secondary meaning, such as descriptive elements and functional elements. Thus, the declaration that a trade dress is inherently distinctive should be carefully considered.

## C. LIKELIHOOD OF CONFUSION

Having found that Turtle Wax is not entitled to trade dress protection for Liquid Crystal, the Court need not consider the issue of likelihood of confusion. However I include an analysis of this issue for the sake of completeness. That the trade dress of the two products is similar is undisputed. Both include the following: 1. F-style can, 2. Black background color, 3. Overcaps with sponge applicators inside, 4. The product name prominently displayed at the top of the can, 5. the front end of an automobile pointing from left to right on the lower half of the can, 6. gold colored chime. This is a significant list of common elements for two products which, it is established, are meant to compete head-to-head in a somewhat crowded marketplace. An inspection of the packaging reveals several significant differences, however. First and foremost is the company name of "Simoniz" which appears in large white letters across the top of the Simoniz Ultimate can. First Brands chose to display the Simoniz name in this emboldened and prominent manner because of positive focus group feedback indicating that the Simoniz name is associated with premium, high quality products. (Tr. 549–51, (Plaintiff's Exhibit (hereinafter "PX") 127) The Liquid Crystal can has nothing to compare with this. The only white lettering on its front face is a short descriptive phrase in very small lettering at about the middle of the can. There is no mistaking the fact that one of these products is a Simoniz product and the other is not. In view of the long history of Simoniz products especially Simoniz car polishes in the American marketplace, this difference is very significant. It is unlikely that a consumer will be confused as to the source or origin of either product because a typical purchaser will be able to see immediately that one of the products is a Simoniz product. It is also unlikely that a consumer will mistakenly believe that Liquid Crystal is a Simoniz product and thereby mistakenly take the Simoniz Ultimate can when what he intended to purchase was Liquid Crystal. Consumers by now realize that when a well-known producer puts out a new product, it will invariably display its name prominently along with that of the product. After viewing a Liquid Crystal commercial or advertisement (which does not anywhere mention the familiar word "Simoniz") it is very unlikely that a consumer will walk into a store and purchase a product with the term "Simoniz" prominently displayed. Even if a consumer comes into the store

with an imperfect recollection of the Liquid Crystal brand name, he/she is not likely to believe that it was a Simoniz product.

Another distinguishing characteristic is the fact that the Simoniz Ultimate product states prominently in red letters surrounded by gold immediately under the word "ULTIMATE" that it is a "Car Wax". While Liquid Crystal states that it "contains no wax". There was testimony establishing that to car buffs and users of car wax this difference is significant. Simoniz found in its informal survey that users attach significance to the existence of carnauba wax in a product. There was also testimony that the users of car polish products will likely read the labels carefully. Simoniz Ultimate also contains the phrase "Carnauba Formula" on the front of the can. Thus, the consumer is faced with a clear choice, i.e., to purchase a polish (with no wax) or a car wax.

It must also be noted that the Simoniz Ultimate overcap is now an opaque black as opposed to a smoked or translucent grey. I find very little in common between plaintiff's "The Ultimate 'Stop and Stare' Automobile Polish" and defendant's "For That Show Stopping Shine". Finally, the price of the products must be taken into account. The defendant's marketing strategy, as pointed out above, was to make its product a cheaper alternative to the rather high-priced Liquid Crystal ($6.99 as opposed to $14.00 to $17.00), while still satisfying the customer's desire for a premium product. Such a strategy denotes an intent to differentiate the products, not confuse them. If plaintiff hoped to get a free ride on the back of the Liquid Crystal trade dress, it would not benefit by pricing its product significantly cheaper. The price difference alone is enough to make the consumer stop and take notice of the fact that these are two significantly different products.

These differences are made even more significant when we take into account the fact that there are numerous third party automotive appearance products using similar trade dresses, (Tr. 137–138) and that there is a trend in this area for other manufacturers to follow the trade dress of a leader in a particular product. (Tr. 137–138). Several examples were given of how particular types of products seem to all be packaged in a predominant color such as red (presumably because the brand name leader in that line of products is in red) or in black or in yellow (antifreeze products), etc. so that it seems very likely that the typical consumer in this area is accustomed to looking closely at the product he is purchasing. Under these circumstances it is much more likely that Simoniz Ultimate will simply be viewed as being in the same class, i.e., a premium wax, as Liquid Crystal, rather than being actually confused with Liquid Crystal. While Simoniz Ultimate may have succeeded in copying a combination of colors and general style which Liquid Crystal earlier recognized as being popular and functional, the resulting trade dress is not such as to create a likelihood of source or product confusion in the mind of the typical customer.

Turtle Wax has clearly failed to meet its threshold burden of establishing a reasonable likelihood of success on the merits of its trade dress. Therefore, I will not discuss the inadequacy of a remedy at law nor the existence of irreparable harm. In accordance with *Ping v. Nat'l Educ. Ass'n*, 870 F.2d 1369, 1371 (7th Cir.1989), I will end my discussion here.

In conclusion, I recommend that the Court deny Turtle Wax's motion for a preliminary injunction because it has failed to show there is a likelihood of success on the merits.

Respectfully submitted,

/s/ Ronald A. Guzman
RONALD A. GUZMAN
United States Magistrate
Judge

DATE: MARCH 28, 1991

Copies to:

Attorneys for plaintiff
J. Patrick Herald
Philip J. Zadeik
William Lynch Schaller
Baker & McKenzie
One Prudential Plaza
130 East Randolph Drive
Suite 3200
Chicago, IL 60601
Attorneys for defendant

Jack C. Berenzweig
Jerome Gilson
Thomas Michael O'Malley
Thomas Alan Schmidt
Willian, Brinks, Olds, Hofer, Gilson & Lione
455 Cityfront Plaza Drive
Suite 3600
Chicago, IL 60611

# Introducing Liquid Crystal Automobile Polish.

- Liquid Crystal· answers the question: "What is the best car wax or polish I can buy?"
- So effective, Liquid Crystal· guarantees protection that lasts a car's lifetime.*
- Liquid Crystal· provides the World's Best Shine.

- No Turtle Wax· identification on package: Liquid Crystal· will expand the market and appeal to new consumers.
- Liquid Crystal· contains the finest quality, top-grade ingredients possible.
- More profits per square inch.
- Permanent floor-stand available. (Holds up to 72 units.)
- Hard-hitting, highly visible advertising will communicate that Liquid Crystal® provides the ultimate shine and protection.

\* Regular Use Recommended.

# Nationwide Advertising Support.

Liquid Crystal® will receive significant media support separate from the line of Turtle Wax® branded products. A hard-hitting, nationwide television and print campaign will help provide the support to make this product a winner.

High quality, permanent floor stand display will greatly increase turns of this high margin product. Display holds up to 72 units.

N00569

| LIQUID CRYSTAL® | | No / Case | Individual Declared Wt | Outside Case Dim. (L) | (W) | (H) | Cube (Feet) | Shipping Wt./Case | Cases/ Pallet | UPC Code 74660— |
|---|---|---|---|---|---|---|---|---|---|---|
| T-33 | Liquid Crystal· Liquid | 12 | 16 0 oz. | 13³/₈" | x 9⁷/₈" | x 8⁷/₈" | 0.7 | 18.0# | 84 | 01033 4 |
| T-34 | Liquid Crystal· Cream | 12 | 16 0 oz. | 17¹/₂" | x 12" | x 9⁵/₈" | 1 2 | 19.0# | 63 | 01037 2 |
| T-833 | Liquid Crystal· Floor Display | 1 | 25.0 lbs. | 50" | x 23" | x 15" | 9.9 | 25.0# | 10 | 01843 |

ℰ 1990, Turtle Wax Inc

Printed in U.S.A.
Form #D-1486

# Simoniz®... The Ultimate Choice.

With the successful segmentation of the market with Non-Abrasive, for clear coat finishes, and Deep Cleaning Wax, for conventional finishes, SIMONIZ· has established a strong foundation in the wax market. To build upon this base, SIMONIZ introduces the Ultimate Choice...new Ultimate and Detailer's Choice Car Waxes.

Ultimate Car Wax is formulated to meet the needs of the younger, heavy car wax user who demands the ultimate shine. Laboratory tests among the top selling waxes and polishes revealed Ultimate Car Wax as the brightest shining, longest lasting wax.

New Detailer's Choice can furnish the more sophisticated car wax user that beautiful look offered by a professional detailer at a fraction of the cost.

From the makers of SIMONIZ.

PLAINTIFF'S EXHIBIT 141

SIMONIZ

Easy To Use Liquid

SIMONIZ

**Detailer's Choice**
PROFESSIONAL CAR WAX
The Secret Behind the Detailer's Shine

Easy to Use Liquid
Contains Carnauba
Safe for All Finishes
From the Makers of SIMONIZ

CAUTION: COMBUSTIBLE SEE BACK 16 FL. OZ. (473 ml)

(Circle 38 on Product Information Card)

B FIRST BRANDS